994 So.2d 547 (2008)
In the Matter of Dawson PRIMES
v.
LOUISIANA STATE BOARD OF PRACTICAL NURSE EXAMINERS.
No. 2007-CA-1638.
Court of Appeal of Louisiana, Fourth Circuit.
July 23, 2008.
Opinion Granting Reconsideration September 17, 2008.
*548 Randall A. Fish, Lacombe, LA, for Plaintiff/Appellee.
Francis B. Mulhall, Metairie, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge MAX N. TOBIAS, JR.).
JOAN BERNARD ARMSTRONG, Chief Judge.
The Louisiana State Board of Practical Nurse Examiners (the Board) suspensively appeals a judgment of the Civil District Court for the Parish of Orleans setting aside the Board's Order suspending Dawson Primes' license as a Licensed Practical Nurse (L.P.N.) and modifying the Order with respect to substance abuse evaluation and treatment. For the reasons that follow, we affirm the judgment of the trial court reversing the order of the Board.
On November 8, 2005, the Board filed a formal complaint against Mr. Primes, alleging violations of La.R.S. 37:969 A(4)(c), (d), and (f), and Louisiana Administrative Code, title 46, Part XLVII, Subpart 1, Section 306 T(3) and (4) and (8)(a), (g), (j), (l), (p), (q), and (r). The complaint arose from a report that Lakeview Medical Center (Lakeview) referred to the Board.
The Board held a full hearing concerning the Lakeview report on December 1, 2005 and January 10, 2006, at which eight witnesses testified. The witnesses included Mr. Primes, Registered Nurses Tina Coker, Candace Young, Susan Waller, Melanie Comeaux, Jane Romero, Ian Fitzgerald and Lisa King.
Mr. Primes testified at the hearing that he is thirty-three years old, has been married for ten years and is the father of a five-year-old son and a sixteen-year-old stepson. He graduated from Indian High School and attended Southeastern Louisiana University for two years before joining the Army National Guard (Guard) in 1992. He graduated from L.P.N. school at Louisiana Technical College in 1995 and holds a license as an L.P.N. Prior to Hurricane Katrina, Mr. Primes was enrolled in Southwest Mississippi Community College in an Associate Degree Nursing Program. Upon completion of the semester he was attending at the time of the storm and one additional semester, he will be eligible to apply for a license as a registered nurse. Mr. Primes testified that it was his desire to complete this certification program and become a registered nurse.
When he joined the Guard in 1992, his military occupational specialty was engineer electrician. After his training at Ford Leonard Wood, Missouri, he returned to Louisiana and served for six years with Company B, 205th Engineer Battalion. He then took a transfer for promotion to the 22 25th panel bridge unit as a combat engineer. Following additional training at Camp Cook, he became a construction supervisor. He has served *549 seven overseas duty assignments, to Belize, Afghanistan, Honduras, Germany and Panama, the longest of which was in Afghanistan as part of Operation Enduring Freedom from May of 2003 to June of 2004. In Afghanistan, he was attached to the French Special Forces as a combat engineer and functioned somewhat as a nurse during a shortage of medical personnel. During Hurricane Katrina's aftermath, he served as liaison between Tangipahoa Parish and the state government, then moved to the Convention Center in New Orleans where he lived and provided patrols for two and a half months. At that time, he served as night shift supervisor, supervising thirty-four troops who patrolled New Orleans' streets. He then became the Guard's liaison to the Louisiana Recovery Authority, in which position he continued to serve at the time of the hearing in the instant case, under a joint task force for hurricane relief.
Mr. Primes testified that he would go off active duty orders on February 23, 2006, at which time he planned to go back to work as a nurse for Primecare Home Health (Primecare), under the supervision of Lisa King, R.N.
Mr. Primes testified that his civilian employment since 1995 has been as a nurse, first at North Oaks Medical Center (North Oaks), a multi-care hospital in Hammond. He worked mostly in the comprehensive medical rehabilitation unit, working with recovering stroke patients and the like and providing nursing care while the patients underwent therapy. His responsibilities included dispensing medications. He was never disciplined or counseled for any reason while employed at North Oaks.
After a year in that position, he was offered a position at Dixon Medical Center (Dixon) in Covington, where he worked for five years. He was never disciplined or counseled for any reason while employed at Dixon. Towards the end of 1999, he was working at Dixon full-time, and doing some work at Lakeview. Lakeview offered him a position with an increase in his salary, whereupon he resigned from Dixon and went to work for Lakeview in the latter part of 1999. He worked for Lakeview until May of 2005.
We have reviewed the evidence presented to the Board and reviewed by the trial court with respect to each of the allegations made against Mr. Primes.
January 4, 2000: Mr. Primes was given a written warning for signing that he performed accuchecks, blood cultures, and administered antibiotics when he had not done so.
The record does not contain testimony or other evidence adduced at the Board hearing concerning this allegation
September 14, 2000: Mr. Primes was given a written warning alleging that he missed administering doses of Ancef and Methyldopa. No medications were removed from the pyxis machine, and the medications were not charted.
The record does not contain testimony or other evidence adduced at the Board hearing concerning this allegation.
March 14, 2002: Mr. Primes was given a written warning for allegedly having failed to follow hospital policy regarding the wastage of narcotic drugs.
The record does not contain testimony or other evidence adduced at the Board hearing concerning this allegation.
January 29, 2005: Mr. Primes was suspended from Lakeview for removing Zolpedem, Flexeril, and Oxycodone without having documented the removal of these drugs. Mr. Primes allegedly left the facility for a break without punching out, in violation of hospital policy, and did not return to his *550 assigned position in the intensive care unit (ICU) from 0055 until 0240. On April 8, 2005: Lakeview received a letter from an attorney representing Mr. Primes concerning his absence from the ICU in January of 2005. According to the attorney, Mr. Primes notified a nurse working with him that he was going to take a smoking break, and the nurse agreed to monitor his patients during his absence. Mr. Primes left the premises and encountered car trouble on his way back to the hospital, and made every attempt to return as soon as possible. On his return, he was met by several staff members who asked that he volunteer for a drug screening, which he did. The screening was negative for drugs.
At the hearing, Mr. Primes testified concerning his activities on January 29, 2005, when he was on duty in Lakeview's ICU. He had attended his nursing class from 8:00 until noon. He went to his regular day shift at Lakeview, where he was asked to work the night shift that evening for double time. He agreed to work the shift beginning that evening at 7:00. When he went to work, he became responsible for two patients. According to the report he received from the previous shift, his patient in ICU 10, who was on a ventilator, had been agitated all day and had fallen out of the bed. Mr. Primes went to see the patient, and, although the patient appeared to be "kind of agitated[1]", he did not seem to be, in Mr. Primes' opinion, "too bad". Mr. Primes took care of his patients from 7:00 p.m. until about 1:00 a.m. without a break. At about 12:30 a.m., the patient in ICU 10 was becoming more agitated and began to reach and grab at things in his room, grabbing and pulling at his lines. Mr. Primes testified that he went in to try to calm him down, stroking the top of his head in the way Mr. Primes did for his own son. The patient remained agitated, because he had had gastrointestinal bleeding and was having "a rough time." Mr. Primes called the patient's primary care manager, Dr. Tviet, and asked if there was something that could be done to help this patient. Dr. Tviet was familiar with the patient, and when Mr. Primes informed the doctor that the patient was pulling at wires and had fallen on a previous shift, the doctor told Mr. Primes to write an order for the patient to receive Ativan and two to ten milligrams of Dilaudid. Dr. Tviet told Mr. Primes that, since the patient was on a ventilator, he could be given the full amount of the prescription to get the patient through to the end of the shift. Mr. Primes then wrote the order, went into the Accudose machine and took out those medications. He asked the nurse for someone to give this push medicine for him. The nurses were busy, and the patient was growing more and more agitated, so Mr. Primes gave the medicine. He testified that he knew he was not supposed to give that medicine, but gave it at the request of the registered nurses, who were busy attending other patients one-on-one. Mr. Primes testified that he was among the group of L.P.N.s, who were allowed to work in the Lakeview ICU, and because he was in the clinical stage of his R.N. training, some of the nurses were comfortable with his giving this type of medication. While not in keeping with the formal rules, he testified that this happened occasionally.
After Mr. Primes administered the medication, his patient became calm, Mr. Primes changed his linens and made the *551 patient comfortable, and took a break. He told the nurses at the ICU nursing station that he wanted to take a smoke break. It was the policy in the unit that when a nurse went out for a break, the other nurses would cover for him or for her. Because of hospital policy that prohibited smoking on the hospital property, even within the confines of the smoker's own car, Mr. Primes was required to leave the hospital grounds in order to smoke a cigarette. In compliance with this policy, he drove his car out of the parking lot and onto a frontage road with the intention of making a circle of a few miles and returning. He had traveled for about two and a half miles and was returning to the hospital when his car lights flickered on and off, the car started "chugging", and died. Mr. Primes was unable to restart the car, opened the hood, but, not really knowing what he was looking at, finally shut the hood, locked the car and started to walk the two and a half miles or so back to the hospital. After he had walked for about a mile and a half in the cold without a jacket and in his "scrubs", he was given a ride by a man in a red pickup truck. Mr. Primes described the problem, and the man opined that the car's alternator had failed, and offered to help start the car. They returned to Mr. Primes' car, and the gentleman tried to restart the car with jumper cables. After the battery had charged for about fifteen minutes, the car was able to start. The truck driver followed Mr. Primes for about two miles down the road to a store that is located approximately a quarter mile before the turnoff into the hospital's entrance, where the car died again. The truck driver reapplied the jumper cables and charged the battery for another ten or fifteen minutes, whereupon the car started again.[2] Mr. Primes drove to the hospital, parked and walked through the hospital to the service elevator, then went up the stairs to the ICU. By then, he had been gone about an hour and a half. He explained that he had left his cellphone in a pocket of his jacket on the back of a chair in the ICU, so that he was unable to call the hospital to inform them of the problems with his car. As soon as he returned, he washed the grease off his hands at the ICU hand washing station and was met by Ms. Julie Detomo, the compliance officer, by Ms. Susan Waller, the night shift supervisor, and by a security guard. He was very upset and agitated because he had been gone so long and had not been able to call the hospital to explain his absence. He knew, however, that his patients were being taken care of while he was gone. Ms. Detomo told him to take his things and come with her. He packed up his schoolbooks and followed Ms. Detomo, Ms. Waller and the guard to the physicians' lounge, where they told him of the report that he had been off the floor and had taken medication from the Accudose prior to leaving. He was advised that he was under suspicion of having taken the drugs himself. He offered to take a drug test, and, under the supervision of a male emergency room nurse, gave a urine sample. He gave a statement, and was suspended pending the results of the drug test. Ms. Detomo and the guard escorted him from the hospital. The guard had to use jumper cable to get Mr. Primes' car to start. Mr. Primes then drove to a nearby gas station and called his wife to pick him up. The next day he called Pritchard's Repair Service to pick up his car.
Approximately a week later, Ms. Tina Coker called to advise him that his drug *552 test was negative[3]. She told him, "I am so elated. Your drug test was negative, as I knew it would be. I need you to come in." Ms. Coker advised him he would need to sign a written warning, which he did, and he then began to work on the fifth floor at Lakeview.
Ms. Tina Coker, R.N., chief nursing officer at Lakeview Regional Medical Center in Covington, testified that she oversaw a couple of investigations of Mr. Primes. In January of 2005, at about 5:00 in the morning, risk manager Julie Detomo, called Ms. Coker to report that she had observed Mr. Primes acting very strangely at the hospital at 3:00 in the morning. Based on her conversation with Ms. Detomo, Ms. Coker spoke to Mr. Primes, who told her he had left the unit without having clocked out. He complained of car trouble and was away from the unit without calling in for over two hours.[4] The supervisor, Susan Waller, two nurses, Candace Young and Melanie Comeaux, and Ms. Detomo reported concerning Mr. Primes' conduct, and as a result of her conversations, Ms. Coker ordered Mr. Primes to submit to a drug test. Ms. Coker required these witnesses to submit written statements.
Ms. Young also testified that Mr. Primes had on several occasions left the unit for many hours on her shift. Lakeview's policies allowed nurses in Mr. Primes' position to take a thirty-minute lunch break and two fifteen-minute personal breaks during the course of their shifts. According to Ms. Young, Mr. Primes would say that he was going to smoke, would leave, and would not return to the unit for at least an hour. She testified that he may have asked her on occasion to watch his patients during his absence from the unit. On January 29, 2005, she observed him return from what she described as a "two hour absence"[5] red-faced and looking "aggravated." She admitted on cross-examination that this "aggravation" could have been caused by the break-down of Mr. Primes' automobile on that occasion. Ms. Waller confronted Mr. Primes on his return to the unit, and observed that he had an angry look, his face was red and his eyes were glazed over. She asked Mr. Primes why he had not called to report his problem and explain his absence, and he replied that his cellular phone was in his jacket in the unit. She searched for the jacket by phoning Mr. Primes' cellular phone number, but heard no ringing and could not find the phone or jacket. Because Mr. Primes had told her previously that his car had OnStar service, she concluded and reported that he had not used the OnStar service to report his car problem to the hospital. She reported the incident to Herman Frank, who was supervising the unit at the time. Mr. Frank asked Ms. Waller to call his supervisor, Kelo McKay, who, in turn, told Ms. Waller to call Julie Detomo. She sent Ms. Detomo an email recounting the foregoing activities and observations.
Jane Romero, R.N., testified that she had worked once or twice with Mr. Primes in the ICU. According to Ms. Romero, on the evening of January 29, 2005, she was working with Mr. Primes in the Lakeview ICU, when she overheard him calling a physician for some drug orders for one of his patients whom he described as agitated. She saw him go to the Accudose *553 machine and remove some medicine, and sign out for ten milligrams of Dilaudid, which Ms. Romero described as "sort of a large dose." The patient's medical orders indicated Dilaudid in a dose of between two and ten milligrams. She then saw him leave the premises. Mr. Primes was gone for a couple of hours and when he returned he came up the back stairs. She observed that he was "beet red, appeared to be sweaty, clammy, went straight to the sink, started washing his face, didn't say anything and went to a patient's room." Ms. Romero opined that this is not ordinary behavior for several reasons: (1) he had been gone for two hours[6]; (2) although he had been talkative and "social" with the staff prior to having left the unit, when he came back he did not speak, but immediately rushed up the stairs, washed his face in the sink and went into the patient's room. Ms. Romero admitted on cross-examination that Mr. Primes might have been agitated and red-faced because of car trouble. Before that night, Ms. Romero testified that she had never observed Mr. Primes acting in anything but a professional manner. He had a general reputation among the nursing staff as being a competent, capable L.P.N. and was well-liked. Like Ms. Comeaux, Ms. Romero did not recall if Mr. Primes had asked another nurse to look after his patients during his absence.
Ms. Comeaux testified concerning the extended break Mr. Primes took on January 29, 2005, but did not recall if she took care of his patients during his absence or if he had asked anyone to do so; however, she stated that in light of what she knew about Mr. Primes over their years of practice at Lakeview, such a request would have been consistent with his practice and professionalism.
February 3, 2005: Mr. Primes was given a written warning because he removed Lorzapan, Flexeril, morphine, and hydromorphone without documentation. Mr. Primes was cited for violation of hospital policy on intravenous drugs.
On January 29, Ms. Coker and Ms. Detomo had a counseling session with Mr. Primes concerning allegations that on multiple occasions Mr. Primes had taken Lorzapan, Zolpedem Tartrate, Meperidine, Oxycodone, Percocet, Flexeril, and Morphine Sulfate drugs out of the Accudose and not given the medication to patients, and that he had administered a push IV without authorization. As to the Percocet, the documentation showed that on three occasions, Mr. Primes removed two tablets, while only one tablet was prescribed. Mr. Primes told Ms. Coker that he thought two tablets had been ordered. Ms. Coker testified that she did not know if the two Percocet tablets were administered on any of the three occasions.
Mr. Primes was questioned concerning the allegation contained on the Employee Conference Form relating to the January 29, 2005 conference. Mr. Primes testified that he took Flexeril and Ambien in pill form out of the Accudose for Ms. Comeaux's patient. He administered these pills to the patient in front of Ms. Comeaux. Mr. Primes testified that he did not make a record of this at the time, intending to make the record documentation at the end of the shift, as is the common practice in the unit. He testified that the medications were administered appropriately, and that he was removed from the unit by Ms. Detomo before he *554 was able to make the proper record of the administration of the drugs to the patient. For the same reason he was unable to document the patient record with the administration of the drugs. The failure to document the patient record was the subject of another Employee Conference Form dated February 3, 2005, which conference was initiated by supervisor Kelo McKay.
Ms. Melanie Comeaux, R.N. testified at the hearing that she worked at Lakeview with Mr. Primes. According to Ms. Comeaux, one of her patients asked for a sleeping pill during a time when she was very busy. Mr. Primes overheard the request and offered to give the medicine to the patient, whose room was adjacent to his patients' rooms. Ms. Comeaux saw him give her patient a handful of pills, the sleeping pill and the patient's routine medications, with water. When she reviewed her Medication Administration Record, she noted that the medicine administered by Mr. Primes to her patient had not been signed off on the record.
Ms. Candace Young, R.N., testified that she worked with Mr. Primes at Lakeview and was involved with the investigation of his IV pushes. An L.P.N. such as Mr. Primes is not authorized to administer drugs by IV push, that is, direct injection of a drug into a patient's IV line. According to Ms. Young, on January 29, 2005, Mr. Primes was working in her unit, and she heard him call to advise his physician that his patient wanted more pain medicine. The doctor asked who was giving Mr. Primes' push IVs, and Mr. Primes identified Melanie Comeaux. Ms. Comeaux denied having given the medication. Ms. Young testified that while she was looking at the monitors showing activity in the patients' rooms, she witnessed Mr. Primes pushing something in his patient's IV line, and called the house supervisor, Susan Waller. Ms. Waller continued the investigation from that point forward. Ms. Waller, a registered nurse, testified at the hearing. She confirmed that Ms. Young called her to the ICU on January 29, 2005, because of concerns about Mr. Primes' having given IV push narcotic medication. She was called to the unit by Ms. Young at about 12:30 a.m. concerning Mr. Primes' allegedly having given IV push medication to a patient. She then went to the pharmacy to check the nurses' reports of medications given.
Ms. Comeaux was not aware of Mr. Primes having given IV drug pushes to any patients, and testified that she had never given him authority to do so.
Ms. Young also testified that she saw Mr. Primes on one occasion patting a patient on the head in the manner one would pat a pet. Mr. Primes testified that he had training in developing a therapeutic bedside manner and utilizing therapeutic touch in treatment. According to Mr. Primes, every nurse develops his or her own way of soothing a patient, and he often pats the heads of his short-haired patients as a method of soothing them.
February 10, 2005: Mr. Primes was given a written warning for allegedly on three occasions having removed two tablets, while having documented removing only one.
Mr. Primes was questioned concerning an Employee Conference Report dated a week later, February 10, 2005, documenting an interview with Ms. Detomo. This conference addressed a chart audit of medication administrative records from February 9 and 10, 2005. According to Mr. Primes, he was caring for eight patients that day, and the drug being administered to several of these post-operative patients was usually Percocet. Typically, the order reads one to two tablets every four hours. Several of his patients were receiving two *555 tablets at a time. He administered one tablet to the patient in question, who was still in pain after having received the pill. Approximately a half hour later, he administered a second tablet; however, he then noticed that the physician's order for this patient was for only one tablet. Mr. Primes admitted that this was a mistake. However, he testified that he did administer the tablet to the patient.
May 10, 2005: Mr. Primes allegedly removed drugs but did not administer them to his patient.
Ms. Coker and Mr. Primes had another counseling session on May 10th, concerning a complaint from the nurse who had just taken over a patient's care after Mr. Primes' shift had ended. According to Ms. Coker's testimony, the patient complained of pain, and when the nurse checked the patient's chart, she discovered that Mr. Primes had given the patient Oxycodone. When the nurse told the patient that the medication had just been administered, the patient said the Oxycodone had not been given. Ms. Coker said this "sent up a red flag" because the patient was coherent. Furthermore, any time a patient denies having received pain management, "something is going on" that interferes with the institution's obligation to manage the patient's pain. Ms. Coker directed Ms. Detomo to initiate an investigation. During the course of the investigation it was determined that twelve Oxycodone tablets had been taken out on May 7, and that Mr. Primes had used another nurse's name, that of Ian Fitzgerald, to provide the drug. Ms. Coker also claimed that "some" of the patients for whom the Oxycodone had been withdrawn had neither complained of pain nor received the drug on that occasion. Mr. Fitzgerald immediately volunteered to undergo a drug test, and the result was negative. Following that conference, Mr. Primes' employment with Lakeview was terminated for inappropriate documentation.
Mr. Primes was questioned concerning an Employee Conference Report dated May 10, 2005. The report notes that the reason for the conference was Mr. Primes' termination following a patient's complaint that Mr. Primes did not give him medicine on the afternoon of May 7, 2005. Mr. Primes testified that he did administer the medicine to the patient. He described the procedure by which this type of medicine is administered. The nurse takes a cart containing the medicine into the patient's room. He then scans the patient's bracelet, scans the medication, administers the medicine, and removes the cart from the room. Mr. Primes testified that he followed this procedure with the patient, and "absolutely" gave the patient his medication. In his opinion, the patient was not telling the truth in order to receive an additional dose of his medication. Mr. Primes testified that this "happens to every nurse, almost." Mr. Primes admitted that he did not perform a pain re-assessment two hours after having administered the drug, because he was busy with the other seven patients who were under his care.
Ian Fitzgerald, R.N., testified that he worked with Mr. Primes in the Lakeview ICU and described him as a "good nurse and [a] good man." He was working a shift with Mr. Primes on May 7, 2005. Thereafter, he was told that a narcotic drug was logged out under his name, to be given to a patient who allegedly had not received the drug. In order to clear his name and to have some evidence that he was free of drugs, he elected to undergo a drug screening. Because he never learned the results of the screen, he assumed it was negative. He testified that he had no knowledge that Mr. Primes at any time *556 used or ingested any medication from Lakeview.
Mr. Primes was examined concerning the improper logging of the medication, and explained that this related to the patient discussed previously who had claimed he had not received his afternoon medication. According to Mr. Primes, he had inadvertently used Mr. Fitzgerald's scanner when he scanned the patient's bracelet and the drug. Thus, the administration of the medication was documented, but because of the use of Mr. Fitzgerald's scanner, the administration of the drug was attributed to Mr. Fitzgerald. Mr. Primes denied under oath that he knew that he was using Mr. Fitzgerald's scanner, and not his own.
At the May 10, 2005 conference, Mr. Primes was not given the opportunity to undergo a drug test, but was terminated.
Ms. Coker testified that Mr. Primes complained to her of recurrent nightmares associated with his military service in Afghanistan, and of back pain for which he had taken pain medication. Mr. Primes testified that he was injured in Afghanistan when trying to load up a trailer in a procedure that requires four men; only he and one other man were picking up the tongue of the trailer and trying to attach it to the ball of a Humvee. Because the Humvee driver had to drive off quickly after the attachment, he did not have the vehicle in "Park" during the operation. The driver, having forgotten that the vehicle was in gear, took his foot off the brake, causing the vehicle to move forward, placing the entire weight of the trailer on Mr. Primes and his colleague. The colleague let go, and Mr. Primes was jerked to the ground, suffering a back strain. Two or three days later, Mr. Primes returned to the main base and sought medical advice. The doctor prescribed eight hundred milligrams of Motrin, which Mr. Primes took as prescribed through the balance of his deployment until April or May of 2005. He returned home and voluntarily reduced his dosage after having consulted a nephrologist who warned him of potential damage to his kidneys from high dosages of Motrin. Mr. Primes then began an exercise program at the nephrologist's suggestion and was able to stop taking Motrin altogether. He testified that he was still observing his exercise program at the time of the hearing.
Ms. Coker required Mr. Primes to undergo counseling pursuant to an employee assistance program, under which the employer pays for the employee's first five counseling visits. Mr. Primes testified that he went through all five sessions of the counseling program. He testified that he never self-medicated nor did he take any medication from the hospital at any time. The drug test eventually came back negative, whereupon Mr. Primes was allowed to come back to work. On cross-examination, Ms. Coker testified that the negative drug test did not assuage her fear and that of others concerning Mr. Primes' behavior. She advised Mr. Primes of the negative result, and told him that his behavior was too bizarre for there not to be "something else going on." She advised him to address any other issues he might have, including possible drug abuse. She admitted that neither she nor anyone at Lakeview to her knowledge obtained direct evidence that Mr. Primes ever used illicit or prescription drugs inappropriately. She testified that Mr. Primes was inappropriately taking out the wrong number of drug tablets and not documenting the withdrawals properly.
Lisa King, R.N., testified that she supervised Mr. Primes when he was employed at Primecare beginning in May of 2005 until he was deployed to Germany in June of the same year. He returned several *557 weeks later and worked full-time until Hurricane Katrina struck on August 29, 2005, working at Primecare for a total of about three months. She provided his initial direct training. In the course of her supervision of Mr. Primes, she would speak with him every day concerning various patient issues and met with him about three times a week. She testified that Mr. Primes had no hesitation in contacting her or requesting her guidance. She did not recall having prepared a formal supervisory report on Mr. Primes, but had no concerns at all about his competency or his ability to perform his duties as an L.P.N. She testified that Mr. Primes was "an excellent nurse" and that she "very definitely" is ready to have him come back to work at Primecare.
On cross-examination, Ms. King denied any knowledge of the allegations arising out of Mr. Primes' work experience at Lakeview.
Mr. Primes offered without objection a letter from Sean M. Roberts, M.D., a physician who is board certified in internal medicine, critical care pulmonology and nephrology. Dr. Roberts also has one of the largest patient censuses at Lakeview. Dr. Roberts wrote:
I have had the opportunity to observe and work with Mr. Primes for the past three years as a staff physician at Lakeview Regional Medical Center. I typically carry a large inpatient census, therefore I have many opportunities to interact with nurses regarding patient care. Mr. Primes has always been professional and competent in caring for his patients. Furthermore, his clinical knowledge and judgment has [sic] set him apart from his co-workers. His experience and professionalism will keep him in the upper tier of nurses at Lakeview Regional Medical Center. He seems to be eager to help his colleagues and is well-liked by both patients and nurses alike. He's an asset to the nursing staff, and I continue to have confidence in his abilities. Respectfully yours, Sean M. Roberts, M.D.
Mr. Primes testified that he has undergone random drug testing both as a nurse and in the military, the most recent of which was two weeks before the hearing, and all results were negative.
On March 30, 2006, the Board entered Conclusions of Law finding Mr. Primes to be in violation of La.R.S. 37:969 A(4):
(c) as unfit, or incompetent by reason of negligence, habit, or other causes;
(d) as habitually intemperate or addicted to the use of habit-forming drugs; and
(f) as guilty of unprofessional conduct.
The Board further concluded that Mr. Primes was in violation of the Louisiana Administrative Code, Title 46, Part XLVII. Nurses, Subpart 1, Practical Nurses, Section 306(T):
3. as being unfit, or incompetent by reason of negligence, habit or other causes;
8. as being guilty of unprofessional conduct in the following:
a. failure to practice practical nursing in accordance with the standards normally expected;
g. improper use of drugs, medical supplies, or patients' records;
j. intentionally committing any act that adversely affects the physical or psychosocial welfare of the patient;
l. leaving a nursing assignment without properly notifying appropriate personnel;
p. inappropriate, incomplete or improper documentation ...
4. possession of a physical or psychological impairment which interferes with *558 the judgment, skills or abilities required for the practice of practical nursing.
The Board suspended Mr. Primes' nursing license, fined him $500 for the violations contained in the Conclusions of Law, assessed a hearing fee of $500, and required Mr. Primes to undergo a chemical addiction assessment from a Board approved clinician and to secure a letter indicating that he may safely return to the practice of practical nursing and listing all currently prescribed medications and further treatment or therapeutic recommendations. When the foregoing information has been secured and submitted to the Board for review, Mr. Primes will be allowed to submit a written request for reinstatement of his license. Upon payment of the fees and fines, and after the Board's favorable review of the records, Mr. Primes' license may be placed on probation for four years with a series of stipulations concerning notice, stability of employment, supervision, abstinence from the use of controlled substances and alcohol except as may be prescribed by a licensed practitioner and random drug screening at Mr. Primes' expense. The Board did not impose any sanctions or make any requirements concerning the various charges relating to incomplete or incorrect documentation of administration of medications.
On May 10, 2006, Mr. Primes filed a Petition in the district court for review of the administrative adjudication pursuant to La.R.S. 49:964, et seq. That statute sets forth the exclusive grounds upon which an administrative agency's decision may be reversed or modified on appeal. The reviewing court, in this case the Civil District Court for the Parish of Orleans, may reverse or modify the Board's decision if the appellant's substantial rights have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court.... La.R.S. 49:964 G. [Emphasis added.]
In the instant case, Mr. Primes appealed, contending that his substantial rights to his L.P.N. license and employment thereunder have been prejudiced because the administrative conclusions that he is habitually intemperate and addicted to habit-forming drugs are not supported and sustainable by a preponderance of evidence. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues. La.R.S. 49:964 G(6). In the instant case, the Board entered conclusions of law, but did not make any specific findings that one or more witnesses were either credible or not worthy of belief.
The matter proceeded to a bench trial on October 12, 2007, following which the trial court entered judgment vacating the Hearing Officer's findings of fact and conclusions of law finding Mr. Primes to be habitually intemperate or addicted to habit *559 forming drugs; setting aside the provisions of the Board's Order of March 30, 2006 suspending Mr. Primes' L.P.N. license and setting forth terms of reinstatement and probation other than payment of $1,000 in fines and fees; and setting aside the Board's Order requiring substance abuse evaluation or treatment. The judgment requires Mr. Primes to submit to a single drug screen by an entity acceptable to the Board within seven days of October 12, 2007. Upon a negative drug screen, Mr. Primes' license will be reinstated immediately upon documentation of successful completion of an approved course of study in medication administration and documentation approved by the Board, without any further conditions of probation, suspension, or restriction. Upon a positive drug screen, the matter will be reset for further expedited review so as not to prejudice any party's appeal rights.
In light of the terms of the judgment, the only issue on appeal is whether the Board proved, by a preponderance of the evidence, that Mr. Primes was habitually intemperate and addicted to habit-forming drugs. In all other respects, the trial court affirmed the factual findings of the Board and that affirmance has not been appealed.
The Board contends that the district court erred and abused its discretion in reversing the Board's findings of habitual intemperance and drug abuse because Mr. Primes did not carry the burden of proving that the record contains no facts to establish the validity of the charges levied against him, where the Board's decision is supported by a preponderance of the evidence.
The Board cites Armstrong v. Louisiana State Board of Medical Examiners, 03-1241, p. 11 (La.App. 4 Cir. 2/18/04), 868 So.2d 830, 838. In that case, a physician sole practitioner appealed a trial court judgment affirming a disciplinary order imposed by the Louisiana State Board of Medical Examiners for violation of the board's rules concerning treatment of noncancer-related chronic or intractable pain in his treatment of eleven patients. In that case, upholding the trial court's affirmance of the disciplinary order, this Court noted that Louisiana jurisprudence recognizes that in reviewing these cases, courts must be cognizant of "the strong presumption of validity and propriety" of the administrative action, where the judgment imposed on a professional's behavior is a matter peculiarly within the expertise of an agency composed of members of that profession. Armstrong v. Louisiana State Bd. of Med. Examiners, p. 11, 868 So.2d at 838, citing Montalbano v. Louisiana State Bd. of Med. Examiners, 560 So.2d 1009, 1011 (La.App. 4 Cir.1990).
The issue before us is whether, given this presumption and these considerations, the record contains a preponderance of evidence that Mr. Primes is habitually intemperate and addicted to habit-forming drugs. While we recognize the presumption of validity and propriety in the Board's conclusion to that effect, we find nothing in the jurisprudence to indicate that this presumption is irrebutable. We find that the presumption must be read against the explicit statutory pronouncement that the reviewing court is to determine upon its independent review of the record as a whole whether the agency proved its case by a preponderance of the evidence. La.R.S. 49:964 G(6). The trial court applied the presumption, stating on the record:
I will give and I always giveif you check my record, every time I'm up to review an administrative proceeding, I always indicate that there's a presumption that runs with the Board, whatever *560 that administrative Board is, and I give that presumption here.
However, that presumption doesn't lend itself to speculation and guesswork. The decision still has to be based on reason, on reason, and you cannot give a leap of faith to an administrative body simply because it believes based on irritability. That could be attributed to any number of other factors, in fact, factors that would be probably even more prevailing than drug abuse would be.
* * *
The evidence, the only objective evidence, only objective evidence [the drug screening] came up negative, and that's the test that they applied. The only objective evidence was the evidence of the drug test that they gave. That came up negative. They didn't like the way that came up. So, then, they're going to go and say that irritability can also be an outward sign of drugs. Yes, it can be, but so can distress as a result of decompressing or post-traumatic stress as a result of serving his country in Afghanistan. Why don't we give the guy a break and look at it that way.
* * *
They [the Board] made an assumption. You point to something that a reasonable person could conclude that there was a drug abuse problem when the test, the objective test, said no and if the only thing you're going to tell me is they can speculate that that is the case because he was irritable, you know what my response to that is going to be.
The trial court then pointed out that the only proven basis for discipline was inappropriate documentation; however, the Board's Order does not direct Mr. Primes to undergo training in the proper protocol for documentation which, the trial court concludes, would be the reasonable response. The trial court noted on the record:
The documentation thing, plain and simple, was a pretext because you had him dead to right on the documentation. So, what you do then is you used that as a means to do what you wanted to do anyhow, which is the drug testing. Because you start out with the conclusion that he's abusing drugs.
So, you get to that conclusion, you support that conclusion by finding what you know you do have, inappropriate documentation, and then your forget about that [documentation] in terms of the penalty phase, because you don't do anything to try to correct the inappropriate documentation.
* * *
And notice, they wanted to give him the drug screen on the day that, again, he appeared red-faced and irritable, and it comes up negative. The same conduct that was leading them to conclude that there was a drug abuse problem existed on the day that they did the screening and it comes up negative. So, what's the guy got to do to show that he's not dealing with drugs?
In support of the validity of the negative drug test, the trial court noted:
When he came in in January, it was a randomly applied test. He came in; they said he looked red-faced and irritable, and what we're going to do is we're going to give him the drug test because he's in that condition that makes us believe that he's abusing drugs. And that's what they did. It was a random test then.
The only evidence of Mr. Primes' having been red-faced and irritable relates to the January 29, 2005 incident. The objective *561 evidence of record is that he was gone from the unit on an announced smoking break, and remained away from the unit for an hour and forty-five minutes. There is no testimony that he had access to his cellular telephone or a pay telephone during that time. The objective evidence of the February 1, 2005 repair bill from Pritchard's Repair Service supports Mr. Primes' testimony that he had a serious problem with his car two nights before. There is no testimony that anyone saw Mr. Primes use drugs on January 29, 2005. There is, however, the objective evidence of the negative drug test that supports his testimony that his irritability and flushed face were the result of his car having broken down twice, his having walked over a mile in the cold night air without a jacket, clad only in his scrubs, and his facing both an impending substantial car repair bill and supervisors who were waiting to question him concerning his absence. We must agree with the trial court that the evidence contained in this record does not preponderate to support a finding that Mr. Primes was habitually intemperate and addicted to habit-forming drugs.
The Board contends that the trial court erred in substituting its judgment for that of the Board where there was a rational basis, supported by sufficient relevant and admissible evidence, for the Board's Order. The Board cites Davis v. Louisiana State Board of Nursing, 96-0805, p. 4 (La.App. 1 Cir. 2/14/97), 691 So.2d 170, 173. In that case, the court affirmed a trial court judgment affirming the Board's denial of the plaintiff's request to take the National License Examination for Registered Nurses. The appellate court noted that an agency decision is entitled to great weight and should be upheld unless it is manifestly erroneous or arbitrary and capricious, and applied the manifest error standard to the Board's factual findings. In the instant case, the Board made no specific findings of fact, but concluded that Mr. Primes was habitually intemperate or addicted to the use of habit forming drugs. The Board's counsel pointed out to the trial court that neither the Court of Appeal nor the trial court could substitute its judgment for that of the Board. The trial court correctly responded, "As long as the Board's decision is based on the record-on a rational line of reasoning," to which counsel agreed.
Under the manifest error standard of review, and applying both the presumption of validity and propriety and the principle that the trial court may not substitute its judgment for the rationally-based judgment of the Board, we are compelled to conclude that this conclusion by the Board is not supported by the objective and testimonial evidence outlined herein.
The Board contends that insofar as the judgment of the trial court requires Mr. Primes to take a drug test and is, in part, conditioned on the results of that test, it violates La.R.S. 49:964 F and G(6). La. R.S. 49:964 F requires that the review of the Board's order shall be conducted by the court without a jury and shall be confined to the record. La.R.S. 49:964 G(6), cited supra, requires that the reviewing court shall make its own determination by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety.
Initially, we observe that it is clear that the post-trial drug test was not ordered in order to provide evidence that Mr. Primes was or was not under the influence during the time in question. It is clear from the trial court's comments that the purpose of the post-trial test was to provide a safeguard against Mr. Primes' receiving the benefit of reinstatement if he was then abusing drugs. We note from the transcript that there was lengthy discussion *562 among counsel and the trial court concerning the post-trial drug test. At no point in the discussion did counsel for the Board or counsel for Mr. Primes object to the requirement that Mr. Primes undergo a drug test within seven days of the conclusion of the trial. In fact, the timing of the drug test was suggested by counsel for the Board. While Board counsel did not agree that a negative drug test would be conclusively probative as to Mr. Primes' non-use of drugs, at no time was it suggested that a post-trial drug test would violate the provisions of La.R.S. 49:964 F and G(6).
The trial court, having reviewed the transcript of the evidentiary hearing, concluded that indeed there was no evidence of drug abuse. The trial court noted that the Board representative, when asked at the hearing for evidence that Mr. Primes was abusing drugs, replied, "I have none." The trial court properly refused to equate evidence of some irritability on Mr. Primes' part with evidence of drug abuse. Thus, the post-trial drug test, to which no counsel objected, if erroneous as a matter of law is nonetheless surplusage, and the legal error, if any, is harmless.
Our independent review of the record in its entirety convinces us that the Board's judgment concluding that Mr. Primes was habitually intemperate and addicted to habit-forming drugs is manifestly erroneous, and that the Board did not prove that habitual intemperance and addiction by a preponderance of the evidence.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
TOBIAS, J., concurs in part, dissents in part, and assigns reasons.
TOBIAS, J., concurs in part, dissents in part, and assigns reasons.
I respectfully concur in the majority's finding that the record is devoid of evidence that Mr. Primes is "habitually intemperate or addicted to the use of habit-forming drugs."
Where the majority and I have an honest divergence of opinion that requires me to respectfully dissent in part is the decision of the majority to affirm the trial court's reversal of the decision of the Louisiana State Board of Practical Nurse Examiners ("the Board") and not remand to the Board for it to impose a new sanction upon Mr. Primes.
The Board consists of 13 members appointed by the governor: six practical nurses, two registered nurses, and five licensed physicians. La. R.S. 37:962. As health care providers, the Board members understand the nature of the pharmaceuticals that Mr. Primes improperly removed and failed to document and the nature of the job that a licensed practical nurse must perform. The Board had the benefit of hearing Mr. Primes and judging his credibility. Whereas the Board heard the suspicious nature of Mr. Primes' actions, they wrongly concluded that he used drugs based on the record. But such leaves open the question as to what he did with the improperly removed and improperly documented medicines which were scheduled medications. (Certainly the physician board members knew what the pharmaceuticals were used for and how they could be misused; and more likely than not, the nurse members of the Board also understood the nature of the drugs and their potential for abuse.) Did Mr. Primes dispose of the drugs or did he deliver them to a third party? Both parts of the question are unanswered by the record.
The majority fails to fully address and emphasize what the trial court specifically ordered leading to an inaccurate impression of its decision. The trial court stated:

*563 (1) All findings of fact and conclusions of law of the Hearing Officer dated March 30, 2006 [23 February 2006], finding Dawson Primes to be habitually intemperate or addicted to habit forming drugs, and all related findings and conclusions, be and are hereby set aside. All other provisions of the findings of fact and conclusions of law are hereby maintained;
(2) The provisions of the Order of the Board, dated March 30, 2006, requiring substance abuse evaluation or treatment, except as set forth below, and the suspension of petitioner's LPN license, and all terms of reinstatement and probation, other than payment of fines and fees totaling $1,000, be and are hereby set aside.
* * *
(1) Petitioner Dawson Primes submit to a single drug Screen by an agency or entity acceptable to defendant Board, within seven (7) days of October 12, 2007, pursuant to the attached Criteria for Urine Drug Screens;
(2) In the event that the drug screen in negative, petitioner's license to practice nursing will be reinstated immediately upon documentation of successful completion of an approved course of study in medication administration and documentation pre-approved by the Louisiana State Board of Practical Nurse Examiners, said reinstatement without any further conditions of probation, suspension, or restriction;
(3) In the event the petitioner's drug screen is positive, this matter will be reset for further review on an expedited basis so as to not prejudice the appeal rights of any party.
Regardless of how well-meaning the trial court intended to be to protect the Board, Mr. Primes, and the public, I find no law or jurisprudence that permitted the trial court to order a further drug screen. The trial court was obligated to decide the case on the record before it  nothing more, nothing less. La. R.S. 49:964 states that which a trial court can and cannot do in reviewing a decision of an administrative body such as the Board. As the trial court properly determined that no evidence established Mr. Primes improperly used drugs, the trial court should have reversed the decision of the Board and remanded the matter to the Board for a determination of a proper penalty rather than taking it upon itself to fashion a remedy. Alternatively, this court should vacate in part the decision of the trial court dealing with the drug issue and remand the matter to the Board for imposition of a proper penalty on the remainder of Mr. Primes' charges. Neither the trial court nor this court is an expert in that which a licensed practical nurse can and cannot do; that is a matter for the Board which exists to protect the public from unqualified licensed practical nurses and licensed practical nurses who need supervision or further training. See La. R.S. 37:961(2), 969, and 978. The Board is the expert, not the courts. By our decision here, we put the public at risk if in fact the other improper actions of Mr. Primes warrant supervision and action by the Board.

ON APPLICATION FOR REHEARING
Chief Judge JOAN BERNARD ARMSTRONG.
ON REHEARING GRANTED[1].
The Louisiana State Board of Practical Nurse Examiners (the Board) suspensively *564 appeals a judgment of the Civil District Court for the Parish of Orleans setting aside the Board's Order suspending Dawson Primes' license as a Licensed Practical Nurse (L.P.N.) and modifying the Order with respect to substance abuse evaluation and treatment. For the reasons that follow, we affirm the judgment of the trial court reversing the order of the Board.
On November 8, 2005, the Board filed a formal complaint against Mr. Primes, alleging violations of La.R.S. 37:969 A(4)(c), (d), and (f), and Louisiana Administrative Code, title 46, Part XLVII, Subpart 1, Section 306 T(3) and (4) and (8)(a), (g), (j), (l), (p), (q), and (r). The complaint arose from a report that Lakeview Medical Center (Lakeview) referred to the Board.
The Board held a full hearing concerning the Lakeview report on December 1, 2005 and January 10, 2006, at which eight witnesses testified. The witnesses included Mr. Primes, Registered Nurses Tina Coker, Candace Young, Susan Waller, Melanie Comeaux, Jane Romero, Ian Fitzgerald and Lisa King[2].
Mr. Primes testified at the hearing that he is thirty-three years old, has been married for ten years and is the father of a five-year-old son and a sixteen-year-old stepson. He graduated from Indian High School and attended Southeastern Louisiana University for two years before joining the Army National Guard (Guard) in 1992. He graduated from L.P.N. school at Louisiana Technical College in 1995 and holds a license as an L.P.N. Prior to Hurricane Katrina, Mr. Primes was enrolled in Southwest Mississippi Community College in an Associate Degree Nursing Program. Upon completion of the semester he was attending at the time of the storm and one additional semester, he will be eligible to apply for a license as a registered nurse. Mr. Primes testified that it was his desire to complete this certification program and become a registered nurse.
When he joined the Guard in 1992, his military occupational specialty was engineer electrician. After his training at Ford Leonard Wood, Missouri, he returned to Louisiana and served for six years with Company B, 205th Engineer Battalion. He then took a transfer for promotion to the 22 25th panel bridge unit as a combat engineer. Following additional training at Camp Cook, he became a construction supervisor. He has served seven overseas duty assignments, to Belize, Afghanistan, Honduras, Germany and Panama, the longest of which was in Afghanistan as part of Operation Enduring Freedom from May of 2003 to June of 2004. In Afghanistan, he was attached to the French Special Forces as a combat engineer and functioned somewhat as a nurse during a shortage of medical personnel. During Hurricane Katrina's aftermath, he served as liaison between Tangipahoa Parish and the state government, and then moved to the Convention Center in New Orleans where he lived and provided patrols for two and a half months. At that time, he served as night shift supervisor, supervising thirty-four troops who patrolled New Orleans' streets. He then became the Guard's liaison to the Louisiana Recovery Authority, in which position he continued to serve at the time of the *565 hearing in the instant case, under a joint task force for hurricane relief.
According to correspondence dated April 6, 2005, admitted without objection before the Hearing Officer, Mr. Primes was awarded the Bronze Star, the Meritorious Service Medal and the Legion of Merit Medal for his actions during war, and was named the Non-Commissioned Officer of the Year for the State of Louisiana. He was at that time an active member and treasurer of the Roseland Volunteer Fire Department, and an auxiliary police officer for the Roseland Police Department. He had never been arrested nor had any conviction of any kind.
Mr. Primes testified that he would go off active duty orders on February 23, 2006, at which time he planned to go back to work as a nurse for Primecare Home Health (Primecare), under the supervision of Lisa King, R.N.
Mr. Primes testified that his civilian employment since 1995 has been as a nurse, first at North Oaks Medical Center (North Oaks), a multi-care hospital in Hammond. He worked mostly in the comprehensive medical rehabilitation unit, working with recovering stroke patients and the like and providing nursing care while the patients underwent therapy. His responsibilities included dispensing medications. He was never disciplined or counseled for any reason while employed at North Oaks.
After a year in that position, he was offered a position at Dixon Medical Center (Dixon) in Covington, where he worked for five years. He was never disciplined or counseled for any reason while employed at Dixon. Towards the end of 1999, he was working at Dixon full-time, and doing some work at Lakeview. Lakeview offered him a position with an increase in his salary, whereupon he resigned from Dixon and went to work for Lakeview in the latter part of 1999. He worked for Lakeview until May of 2005.
We have reviewed the evidence presented to the Board and reviewed by the trial court with respect to each of the allegations made against Mr. Primes.
January 4, 2000: Mr. Primes was given a written warning for signing that he performed Accuchecks, blood cultures, and administered antibiotics when he had not done so.
Ms. Coker testified that prior to her arrival at Lakeview, there were several conferences at which Mr. Primes was counseled or disciplined with respect to documentation issues. She testified, "It appears that things like he took orders off and didn't put them on the MAR or he didn't follow the orders or he missed dosages, no medications charted on the MAR, no medications removed from PYXIS. That was since XXXX-XXXX all the way up to 2002." Exhibit I admitted without objection at the hearing is a written warning dated January 4, 2000 addressed to Mr. Primes by his immediate supervisor, J. Austin[3], and signed the same day by the supervisor, Mr. Primes, and the department head, Julie Detomo[4]. According to *566 this written warning, the reason for the conference was "Orders signed off-accucheck, insulin, antibiotic, blood cultures." "Relevant factors" were: "Not implemented; not on MAR." Noted as "actions or conclusions" were: "Discussion-Document what you do on notes and MAR".
September 14, 2000: Mr. Primes was given a written warning alleging that he missed administering doses of Ancef and Methyldopa. No medications were removed from the PYXIS machine, and the medications were not charted.
The Board offered as proof of this charge a document labeled "Coach", indicating that Mr. Primes' supervisor, Ms. Detomo, had held a conference with him and interviewed him concerning missed doses of Ancef and Methyldopa on September 6, 2000. Noted as "relevant factors" were "no meds charted on MAR and no meds removed from PYXIS". The action noted is "coaching", and the employee comment, apparently written in the same handwriting as the supervisor's signature and not in Mr. Primes' handwriting, is "voiced understanding." It must be noted that the "employee signature" and "witness signature" lines on this document are blank. Under Ms. Detomo's signature is a signature that appears to be that of "B. Yaniga", dated September 19, 2000.
March 14, 2002: Mr. Primes was given a written warning for allegedly having failed to follow hospital policy regarding the wastage of narcotic drugs.
A Record of Employee Conference form dated March 14, 2002, shows that Julie Detomo initiated a conference concerning Mr. Primes' alleged failure to follow hospital policy regarding the wastage of narcotics. Noted as "relevant factors" was the following comment: "Did not visually witness the actual wastage of the actual medicine, just validated the wastage in the automated medication system." The action or conclusion was "Written warning today. Further occurances [sic] may result in further discipline. Discussion to always follow policy and to report incidents and occurances [sic] as they happen to charge nurse and/or manager/administrator." Ms. Detomo and Mr. Primes signed the record.
Mr. Primes testified that it is important to show where "every drop or every bit of" a controlled substance goes if it does not go to the patient. He recalled the incident, as it was the first serious matter for which he was "written up." According to Mr. Primes, he did not document the wastage of narcotic in this instance because he did not give the medication. A patient was supposed to be receiving 12.5 mg of Demerol. Mr. Primes took out the drug, gave it to the nurse who documented on the MAR that she gave the medicine. Since Mr. Primes was the one who took the drug out of the Accudose machine, it was never shown as wastage. The nurse who gave the medicine showed the amount that she gave, but then, according to Mr. Primes, "we just never got back to the point of . . . actually going somewhere and drawing up the wastage and doing it. We just went on."
June 26, 2002: Mr. Primes was given an oral warning concerning utilization of the time clock.
The record contains a Record of Employee Conference signed by Mr. Primes, his Supervisor, Angel C. Roberts, Department Head Detomo, and two others whose signatures are illegible, one of whom signed as a witness. According to this record, Mr. Primes was given an oral warning for two mis-punches on the time clock on June 7 and 8. the indicated action was, "Oral warning today. Further occurances [sic] will result in discipline action as per policy."
*567 January 29, 2005: Mr. Primes was suspended from Lakeview for removing Zolpedem, Flexeril, and Oxycodone without having documented the removal of these drugs. Mr. Primes allegedly left the facility for a break without punching out, in violation of hospital policy, and did not return to his assigned position in the intensive care unit (ICU) from 0055 until 0240. On April 8, 2005, Lakeview received a letter from an attorney representing Mr. Primes concerning his absence from the ICU in January of 2005. According to the attorney, Mr. Primes notified a nurse working with him that he was going to take a smoking break, and the nurse agreed to monitor his patients during his absence. Mr. Primes left the premises and encountered car trouble on his way back to the hospital, and made every attempt to return as soon as possible. On his return, he was met by several staff members who asked that he volunteer for a drug screening, which he did. The screening was negative for drugs.
At the hearing, Mr. Primes testified concerning his activities on January 29, 2005, when he was on duty in Lakeview's ICU. He had attended his nursing class from 8:00 until noon. He went to his regular day shift at Lakeview, where he was asked to work the night shift that evening for double time. He agreed to work the shift beginning that evening at 7:00. When he went to work, he became responsible for two patients. According to the report he received from the previous shift, his patient in ICU 10, who was on a ventilator, had been agitated all day and had fallen out of the bed. Mr. Primes went to see the patient, and, although the patient appeared to be "kind of agitated[5]", he did not seem to be, in Mr. Primes' opinion, "too bad". Mr. Primes took care of his patients from 7:00 p.m. until about 1:00 a.m. without a break. At about 12:30 a.m., the patient in ICU 10 was becoming more agitated and began to reach and grab at things in his room, grabbing and pulling at his lines. Mr. Primes testified that he went in to try to calm him down, stroking the top of his head in the way Mr. Primes did for his own son. The patient remained agitated, because he had had gastrointestinal bleeding and was having "a rough time." Mr. Primes called the patient's primary care manager, Dr. Tviet, and asked if there was something that could be done to help this patient. Dr. Tviet was familiar with the patient, and when Mr. Primes informed the doctor that the patient was pulling at wires and had fallen on a previous shift, the doctor told Mr. Primes to write an order for the patient to receive Ativan and two to ten milligrams of Dilaudid. Dr. Tviet told Mr. Primes that, since the patient was on a ventilator, he could be given the full amount of the prescription to get the patient through to the end of the shift. Mr. Primes then wrote the order, went into the Accudose machine and took out those medications. He asked the nurse for someone to give this push medicine for him. The nurses were busy, and the patient was growing more and more agitated, so Mr. Primes gave the medicine. He testified that he knew he was not supposed to give that medicine, but gave it at the request of the registered nurses, who were busy attending other patients one-on-one. Mr. Primes testified that he was among the group of L.P.N.s, who were allowed to work in the Lakeview ICU, and because he was in the clinical *568 stage of his R.N. training, some of the nurses were comfortable with his giving this type of medication. While not in keeping with the formal rules, he testified that this happened occasionally.
After Mr. Primes administered the medication, his patient became calm; Mr. Primes changed his linens and made the patient comfortable, and took a break. He told the nurses at the ICU nursing station that he wanted to take a smoke break. It was the policy in the unit that when a nurse went out for a break, the other nurses would cover for him or for her. Because of hospital policy that prohibited smoking on the hospital property, even within the confines of the smoker's own car, Mr. Primes was required to leave the hospital grounds in order to smoke a cigarette. In compliance with this policy, he drove his car out of the parking lot and onto a frontage road with the intention of making a circle of a few miles and returning. He had traveled for about two and a half miles and was returning to the hospital when his car lights flickered on and off, the car started "chugging", and the engine "died". Mr. Primes was unable to restart the car, opened the hood, but, not really knowing what he was looking at, finally shut the hood, locked the car and started to walk the two and a half miles or so back to the hospital. After he had walked for about a mile and a half in the cold, without a jacket and in his "scrubs", he was given a ride by a man in a red pickup truck. Mr. Primes described the problem, and the man opined that the car's alternator had failed, and offered to help start the car. They returned to Mr. Primes' car, and the gentleman tried to restart the car with jumper cables. After the battery had charged for about fifteen minutes, the car was able to start. The truck driver followed Mr. Primes for about two miles down the road to a store that is located approximately a quarter mile before the turnoff into the hospital's entrance, where the car "died" again. The truck driver reapplied the jumper cables and charged the battery for another ten or fifteen minutes, whereupon the car started again.[6] Mr. Primes drove to the hospital, parked and walked through the hospital to the service elevator, then went up the stairs to the ICU. By then, he had been gone about an hour and a half. He explained that he had left his cell phone in a pocket of his jacket on the back of a chair in the ICU, so that he was unable to call the hospital to inform them of the problems with his car. As soon as he returned, he washed the grease off his hands at the ICU hand washing station and was met by Ms. Julie Detomo, the compliance officer, by Ms. Susan Waller, the night shift supervisor, and by a security guard. He was very upset and agitated because he had been gone so long and had not been able to call the hospital to explain his absence. He knew, however, that his patients were being taken care of while he was gone. Ms. Detomo told him to take his things and come with her. He packed up his schoolbooks and followed Ms. Detomo, Ms. Waller and the guard to the physicians' lounge, where they told him of the report that he had been off the floor and had taken medication from the Accudose prior to leaving. He was advised that he was under suspicion of having taken the drugs himself. He offered to take a drug test[7], and, under the supervision of a male *569 emergency room nurse, gave a urine sample. He gave a statement, and was suspended pending the results of the drug test. Ms. Detomo and the guard escorted him from the hospital. The guard had to use jumper cable to get Mr. Primes' car to start. Mr. Primes then drove to a nearby gas station and called his wife to pick him up. The next day he called Pritchett's Repair Service to pick up his car.
The record contains a copy of an Employee Conference Form dated January 29, 2005. The document is signed by Mr. Primes, by his supervisor, Ms. Detomo, and by Administrative Supervisor Susan Waller as witness. The Department Head signature line is blank. According to the conference form, the supervisor initiated the conference, and the reason indicated was suspension. The relevant actions were: Drugs removed from Accudose and not documented in the patient record:
1 Lorazapam [sic] 2 mg/ml @ 2024 1/28/05
2 Lorazapam [sic] 2 mg/ml @2154 1/28/05
2 Zolipdem Tartrate 5 mg @2154 1/28/05
Flexeril 10 mg tab @ 2214 1/28/05
Morphine Sulfate 10 mg @0016 1/29/05
1 Lorazepam 2 mg/ml @ 0017 1/29/05
1 Lorzepam [sic] 2 mg/ml@0018 1/29/05
1 Lorazepam 2 mg/ml@ 0041 1/29/05
5 Hydopmorphone [sic] HCL
Dawson left the ICU unit [sic] at 0055 1/29/05 and did not return until approximately 0240 am 1/29/05.
*570 Actions or conclusions identified on the conference form were, "Urine drug screen per chain of custody and suspended immediately pending investigation."
The Hearing Officer found that Mr. Primes "would/could not explain these discrepancies." However, the conference form contains the following hand-written comments by Mr. Primes: "I left the ICU to go smoke a cigarette when as I passed [illegible] Chrysler, my car started chugging? I was attempting to call but left my phone on unit. when a man stopped and assessed my car, he gave me a "boost" off and told me that it [illegible] only get me back to the hosp. I immediately came back to the hospital. Meds were for Mr. Simmons to Melanie. Melanie physically saw me administer all the pills." Mr. Primes' hearing testimony expanded on this written statement. He testified that the nurse (Melanie Comeaux) was involved with a patient, and that he drew the medicine for her patients so that she would not have to leave the patient. He drew medications for her patients as well as his own, brought them into the room in a cup (all were in pill form) and administered the medications to her patient while she was sitting at the bedside. He testified as to the reason why the administration of these medications had not been charted properly. According to Mr. Primes, often during busy times, charting would be caught up at the end of a shift. He recognized that this is not the ideal way to document administration of medication. Since he was not allowed back into the ICU after his return, but was taken immediately for a drug test, he was unable to chart the medications listed above.
According to Mr. Primes' hearing testimony, approximately a week following the incident, Ms. Tina Coker called to advise him that his drug test was negative[8]. She told him, "I am so elated. Your drug test was negative, as I knew it would be. I need you to come in." Ms. Coker advised him he would need to sign a written warning, which he did, and he then began to work on the fifth floor at Lakeview.
Ms. Coker, chief nursing officer at Lakeview Regional Medical Center in Covington, testified that she oversaw a couple of investigations of Mr. Primes, including that surrounding the incident of January 28-29, 2005. According to Ms. Coker's testimony, in January of 2005, at about 5:00 in the morning, risk manager Julie Detomo, called to report that she had observed Mr. Primes acting very strangely at the hospital at 3:00 in the morning. Based on her conversation with Ms. Detomo, Ms. Coker spoke to Mr. Primes, who told her he had left the unit without having clocked out. He complained of car trouble and was away from the unit without calling in for over two hours.[9] The supervisor, Susan Waller, two nurses, Candace Young and Melanie Comeaux, and Ms. Detomo reported concerning Mr. Primes' conduct, and as a result of her conversations, Ms. Coker ordered Mr. Primes to submit to a drug test. Ms. Coker required these witnesses to submit written statements.
The nurses' statements are part of the hearing record.[10] Ms. Young gave the following *571 statement on January 29, 2005 at 4:45 a.m.:
Candace Young RN Statement 1/29/05 0445am
Dawson had room ICU 12. Candace states that she overheard Dawson call MD regarding "patient being agitated and needing medication". A short time later Candace witnessed Dawson via the monitor (at the secretary's desk) push something in patient ICU 12 IV line. Candace notified Susan Waller house supervisor. Candace further states that she gave no IV push medication for Dawson this shift.
On chart review:
 No medications signed off or noted as given on the MAR (Medication Administration Report) for the 7 pm shift 1/28/05
 Verbal order taken 1/39/05 [sic] @1230am for Versed 1-5 mg IV a1hour prn pain/agitation and Dilaudid 2-10 mg IV q2hour prn pain by Dawson Primes
 Last assessments (flow sheets included charted at 1/28/05 2145pm); No further notes on patient
 Accudose report notes that 1 Lorazepam 2 mg/ml removed at 2024 1/28/05 and at 0018 1/29/05; 1 morphine sulfate 10 mg/ml removed at 2214 1/28/05; 5 Hydromorphone Hcl 2 mg/ml removed at 0051 1/29/05; all under the ICU 12 patient. (See pages 7 and 8 of Accudose report)
Mr. Romero gave the following statement at the same time:
Jane Romero RN Statement 1/29/05 0455 am
Dawson had room ICU 12. Jane states that she overheard Dawson call MD regarding "patient being agitated and needing medication". Jane states that she saw Dawson remove Dilaudid (Hydromorphone Hcl) from the Accudose. Jane states that Dawson then left the unit at 0050 1/29/05 and did not return until 0245. Jane states that Dawson stormed into the unit, red faced, and went straight to the sink to wash his face. Jane states that Dawson then stumbled from the sink to room ICU 12. Dawson was observed holding himself up with a hand on the wall in ICU 12. Jane further states that prior to leaving the unit Dawson was talkative and social. On Dawson's return he was very quiet. Jane states she never gave any IV pushes for Dawson this shift. Jane states that Dawson was also caring for ICU 8 this shift. Jane also notes that Dawson left the unit again at 430[sic]1/29/05, returning a few minutes later [sic] at 410[sic] 1/29/05
On chart review:
 No medications signed off or noted as given on the MAR for the 7 pm shift 1/28/05
 Last assessments (flow sheets included charted at 1/28/05 2145 pm); No further notes on patient
 Accudose report notes that 2 Acetaminopen [sic] 325 mg tab removed at 2115 1/28/05; 2 Lorazepam 2 mg/ml vial removed at 2116 1/28/05 and at 0016 1/29/05 and at 0017 1/29/05; all under the ICU 8 patient. (See pages 7 & 8 of Accudose report).
Ms. Comeaux gave the following statement on January 29, 2005 at 5:05 a.m.:
Melanie Comeaux RN Statement 1/29/05 0505 am
At 2100 Melanie states that she was in room 10 charting when Dawson overheard her talking to a patient regarding a sleeping pill. She states that Dawson called out "he has Ambien ordered." *572 Dawson took ICU 10 MAR and went to Accudose and removed medications along with routine medications. Melanie states he gave 2 handfuls of medications to the patient. Nothing was signed off the MAR. Melanie further states that she gave no IV push medication for Dawson this shift.
On chart review:
 No medications signed off or noted as given on the MAR by Dawson Primes for the 7 pm shift 1/28/05
 Accudose report notes that 2 Zolpidem Tartrate 5 mg tab removed at 2154 1/28/05 and 2 Oxycodone HCL/Acetaminophen tab at 2154 1/28/05 and 1 Cyclobenzaprine Hcl 10 mg tab at 2155 1/28/05; all under the ICU 10 patient. (See pages 7 and 8 of Accudose report.)
Ms. Comeaux's statement appears to support Mr. Primes' contention that the medications he pulled were, in fact, administered to her patients. The Hearing Officer found Ms. Comeaux to be a credible witness.
Ms. Young also testified that Mr. Primes had on several occasions left the unit for many hours on her shift. Lakeview's policies allowed nurses in Mr. Primes' position to take a thirty-minute lunch break and two fifteen-minute personal breaks during the course of their shifts. According to Ms. Young, Mr. Primes would say that he was going to smoke, would leave, and would not return to the unit for at least an hour. She testified that he may have asked her on occasion to watch his patients during his absence from the unit. On January 29, 2005, she observed him return from what she described as a "two hour absence"[11] red-faced and looking "aggravated." She admitted on cross-examination that this "aggravation" could have been caused by the break-down of Mr. Primes' automobile on that occasion.
Ms. Waller, whose credibility was rejected by the Hearing Officer, testified that she confronted Mr. Primes on his return to the unit, and observed that he had an angry look, his face was red and his eyes were glazed over. She asked Mr. Primes why he had not called to report his problem and explain his absence, and he replied that his cellular phone was in his jacket in the unit. She searched for the jacket by phoning Mr. Primes' cellular phone number, but heard no ringing and could not find the phone or jacket. Because Mr. Primes had told her previously that his car had OnStar service, she concluded and reported that he had not used the OnStar service to report his car problem to the hospital. She reported the incident to Herman Frank, who was supervising the unit at the time. Mr. Frank asked Ms. Waller to call his supervisor, Kelo McKay, who, in turn, told Ms. Waller to call Julie Detomo. She sent Ms. Detomo an email recounting the foregoing activities and observations. This testimony, specifically rejected by the Hearing Officer's credibility determination, cannot be considered evidence against Mr. Primes under the manifest error standard of review. See Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989).
Jane Romero, R.N., testified that she had worked once or twice with Mr. Primes in the ICU. According to Ms. Romero, on the evening of January 29, 2005, she was working with Mr. Primes in the Lakeview ICU, when she overheard him calling a physician for some drug orders for one of his patients whom he described as agitated. She saw him go to the Accudose *573 machine and remove some medicine, and sign out for ten milligrams of Dilaudid, which Ms. Romero described as "sort of a large dose." The patient's medical orders indicated Dilaudid in a dose of between two and ten milligrams. She then saw him leave the premises. Mr. Primes was gone for a couple of hours and when he returned he came up the back stairs. She observed that he was "beet red, appeared to be sweaty, clammy, went straight to the sink, started washing his face, didn't say anything and went to a patient's room." Ms. Romero opined that this is not ordinary behavior for several reasons: (1) he had been gone for two hours[12]; (2) although he had been talkative and "social" with the staff prior to having left the unit, when he came back he did not speak, but immediately rushed up the stairs, washed his face in the sink and went into the patient's room. Ms. Romero admitted on cross-examination that Mr. Primes might have been agitated and red-faced because of car trouble. Before that night, Ms. Romero testified that she had never observed Mr. Primes acting in anything but a professional manner. He had a general reputation among the nursing staff as being a competent, capable L.P.N. and was well-liked. Like Ms. Comeaux, Ms. Romero did not recall if Mr. Primes had asked another nurse to look after his patients during his absence.
Ms. Comeaux testified concerning the extended break Mr. Primes took on January 29, 2005, but did not recall if she took care of his patients during his absence or if he had asked anyone to do so; however, she stated that in light of what she knew about Mr. Primes over their years of practice at Lakeview, such a request would have been consistent with his practice and professionalism.
Ms. Coker required Mr. Primes to undergo counseling pursuant to an employee assistance program, under which the employer pays for the employee's first five counseling visits. Mr. Primes testified that he went through all five sessions of the counseling program. He testified that he never self-medicated nor did he take any medication from the hospital at any time. The drug test he took in connection with the January 28-29, 2005 incident eventually came back negative, whereupon Mr. Primes was allowed to come back to work. On cross-examination, Ms. Coker testified that the negative drug test did not assuage her fear and that of others concerning Mr. Primes' behavior. She advised Mr. Primes of the negative result, and told him that his behavior was too bizarre for there not to be "something else going on." She advised him to address any other issues he might have, including possible drug abuse. She admitted that neither she nor anyone at Lakeview to her knowledge obtained direct evidence that Mr. Primes ever used illicit or prescription drugs inappropriately. She testified that Mr. Primes was inappropriately taking out the wrong number of drug tablets and not documenting the withdrawals properly.
February 3, 2005: Mr. Primes was given a written warning because he removed Lorzepan, Flexeril, morphine, and hydromorphone without documentation. Mr. Primes was cited for violation of hospital policy on intravenous drugs.
On February 3, 2005, Ms. Coker, Ms. McKay and Ms. Detomo held a counseling session with Mr. Primes concerning allegations that he had taken Lorzepan, Zolpedem *574 Tartrate, Meperidine, Oxycodone, Percocet, Flexeril, and Morphine Sulfate drugs out of the Accudose and not given the medication to patients, and that he had administered a push IV without authorization. These allegations arose out of the January 28-29, 2005 incident. The Employee Conference Form generated in connection with this conference was signed by Mr. Primes, Ms. Detomo as Supervisor, Ms. McKay as Department Head, and Ms. Coker as witness. The form notes the lack of proper documentation of controlled medications' administration pursuant to Policy and Procedure Medication Administration 003.38, step 6, which requires that after administration of medication, the nurse shall "initial MAR next to indicated time." The form also notes that his administration of an IV push medication to ICU 12 patient is outside the scope of practice for an L.P.N. at Lakeview, pursuant to Policy I-4 IV Therapy Standards, Procedure F6. According to Louisiana State Board of Nursing regulations, registered nurses may not delegate administration of medications by IV push (bolus), other than those defined by health agency protocol for emergency situations. The report also cites Mr. Primes for having been absent on a smoking break without having clocked out and for longer than the fifteen minutes provided for in Lakeview's employee handbook, and for not having called the facility during his absence from the unit.
Mr. Primes was questioned concerning the allegations contained on the Employee Conference Form relating to the February 3, 2005 conference. He testified that he took Flexeril and Ambien in pill form out of the Accudose for Ms. Comeaux's patient. He administered these pills to the patient in front of Ms. Comeaux. Mr. Primes testified that he did not make a record of this at the time, intending to make the record documentation at the end of the shift, as is the common practice in the unit. He testified that the medications were administered appropriately, and that he was removed from the unit by Ms. Detomo before he was able to make the proper record of the administration of the drugs to the patient. For the same reason he was unable to document the patient record with the administration of the drugs. The failure to document the patient record was also the subject of the Employee Conference Form dated February 3, 2005.
Ms. Melanie Comeaux, R.N. testified at the hearing that she worked at Lakeview with Mr. Primes. According to Ms. Comeaux, one of her patients asked for a sleeping pill during a time when she was very busy. Mr. Primes overheard the request and offered to give the medicine to the patient, whose room was adjacent to his patients' rooms. Ms. Comeaux saw him give her patient a handful of pills, the sleeping pill and the patient's routine medications, with water. When she reviewed her Medication Administration Record, she noted that the medicine administered by Mr. Primes to her patient had not been signed off on the record.
The Hearing Officer found that Mr. Primes administered intravenous push medications to his patients in direct violation of agency policy, which expressly prohibits registered nurses on the staff to delegate this function to a L.P.N. Ms. Candace Young, R.N., testified that she worked with Mr. Primes at Lakeview and was involved with the investigation of his IV pushes. An L.P.N. such as Mr. Primes is not authorized to administer drugs by IV push, that is, direct injection of a drug into a patient's IV line. According to Ms. Young, on January 29, 2005, Mr. Primes was working in her unit, and she heard him call to advise a physician that his patient wanted more pain medicine. The *575 doctor asked who was giving Mr. Primes' push IVs, and Mr. Primes identified Melanie Comeaux. Ms. Comeaux denied having given the medication. Ms. Young testified that while she was looking at the monitors showing activity in the patients' rooms, she witnessed Mr. Primes pushing something in his patient's IV line, and called the house supervisor, Susan Waller. Ms. Waller continued the investigation from that point forward. Ms. Waller, a registered nurse, testified at the hearing; however, the Hearing Officer did not find her testimony to have been credible. She confirmed that Ms. Young called her to the ICU on January 29, 2005, because of concerns about Mr. Primes' having given IV push narcotic medication. She was called to the unit by Ms. Young at about 12:30 a.m. concerning Mr. Primes' allegedly having given IV push medication to a patient. She then went to the pharmacy to check the nurses' reports of medications given. The foregoing testimony by Ms. Waller, whose credibility was rejected by the Hearing Officer, cannot provide evidentiary support for the Board's findings and action. See, Rosell v. ESCO, supra.
Ms. Comeaux was not aware of Mr. Primes' having given IV drug pushes to any patients, and testified that she had never given him authority to do so.
Ms. Young also testified that she saw Mr. Primes on one occasion patting a patient on the head in the manner one would pat a pet. Mr. Primes testified that he had training in developing a therapeutic bedside manner and utilizing therapeutic touch in treatment. According to Mr. Primes, every nurse develops his or her own way of soothing a patient, and he often pats the heads of his short-haired patients as a method of soothing them.
February 10, 2005: Mr. Primes was given a written warning for allegedly on three occasions having removed two tablets, while having documented removing only one.
An Employee Conference Form memorializes the conference that took place on February 10, 2005. The form bears the signatures of Mr. Primes, Supervisor Detomo and Department Head Coker. The stated reason for the conference was a chart audit of medication administration records from February 9 and 10, 2005. The form notes that while the physician order in question was for 1 Percocet tablet for pain, on February 9, 2005, Mr. Primes removed one tablet at 8:16 a.m. and one at 8:34 a.m. and administered the dosage at 8:56 a.m. via scanning and documentation. On February 9, 2005, he removed two tablets at 11:59 and administered them at 12:30 via scanning and documentation. The same day, he removed two tablets at 6:31 p.m. and administered the dosage at 6:50 p.m. The documentation was for only one tablet on each of the three occasions.
The Hearing Officer found that on February 9-10, 2005, Mr. Primes removed two Percocet tablets from the Accudose machine on three occasions and documented only one tablet as "given". While the documentation showed that on three occasions, Mr. Primes removed two tablets, while only one tablet was prescribed, Mr. Primes told Ms. Coker that he thought two tablets had been ordered. Ms. Coker testified that she did not know if the two Percocet tablets were administered on any of the three occasions.
Mr. Primes was questioned at the hearing concerning the conference report. According to Mr. Primes, he was caring for eight patients that day, and the drug being administered to several of these post-operative patients was usually Percocet. Typically, the order reads one to two tablets every four hours. Several of his patients were receiving two tablets at a time. He administered one tablet to the patient in *576 question, who was still in pain after having received the pill. Approximately a half hour later, he administered a second tablet; however, he then noticed that the physician's order for this patient was for only one tablet. Mr. Primes admitted that this was a mistake. However, he testified that he did administer the tablets to the patient.
May 10, 2005: Mr. Primes allegedly removed drugs but did not administer them to his patient.
The record contains an Employee Conference Form dated May 10, 2005 signed by Mr. Primes, by Supervisor Ms. Detomo, Department Head McKay, Ms. Coker and a witness whose signature is illegible. The indicated reason for the conference was Mr. Primes' termination for removal of medication from the Accudose without proof that it was given to the patient. The conference was initiated by Ms. Detomo, who, along with Ms. Coker, was interviewed. The following relevant factors were noted:
Patient complaint 5/7/05  that [Mr. Primes] never gave medicine in afternoon, that [Mr. Primes] stated "was not in cabinet and cabinet needed refilling". Patient did not receive medication. Patient asked for medication again early evening and was told he had received it already. Patient and family stated that he had never received pain medication and that patient was in pain.
Patient interviewed by night supervisor and director. Patient stated above again.
The review of record 03491648 showed the following:
2 Oxycodone Hcl/APAP 10 mg tab dispensed 5/7/05 0917 Documented given 1015 on eMAR; NOT documented on pain assessment or patient note. Patient states he received.
2 Oxycodone Hcl/APAP 10 mg tab dispensed 5/7/05 1333 Documented given 1414 on eMAR; NOT documented on pain assessment or patient note. Patient states he did NOT receive.
2 Oxycodone Hcl/APAP 10 mg tab dispensed 5/7/05 17:40 Documented given 1759 on eMAR under another nurses [sic] sign-on; who did not administer or care for the patient; NOT documented on pain assessment or patient note. Patient states he never receive [sic].
The review of record XXXXXXXXX showed the following:
2 Oxycodone Hcl/APAP 10 mg tab dispensed 5/7/05 1806 Documented given on eMAR under another nurses [sic] sign on; who did not administer or care for patient; NOT documented on pain assessment or patient note; shift assessment states NO pain.
The conference report contains the following handwritten comment by Mr. Primes:
This patient was given his medications as indicated by e-MAR. Not a good excuse, but no additional pain assessments done due to being busy. I have no excuse and do not know how I documented under another nurse's name; it was not intentional. I do not know why this [patient] would say that they did not get their [sic] medications when I did everything I could to assist this [patient] with their [sic] comfort.
Ms. Coker testified that she and Mr. Primes had a counseling session on May 10th, concerning a complaint from the nurse who had just taken over a patient's care after Mr. Primes' shift had ended. According to Ms. Coker's testimony, the patient complained of pain, and when the nurse checked the patient's chart, she discovered that Mr. Primes had given the patient Oxycodone. When the nurse told *577 the patient that the medication had just been administered, the patient said the Oxycodone had not been given. Ms. Coker said this "sent up a red flag" because the patient was coherent. Furthermore, any time a patient denies having received pain management, "something is going on" that interferes with the institution's obligation to manage the patient's pain. Ms. Coker directed Ms. Detomo to initiate an investigation. During the course of the investigation it was determined that twelve Oxycodone tablets had been taken out on May 7, and that Mr. Primes had used another nurse's name, that of Ian Fitzgerald, to provide the drug. Ms. Coker also claimed that "some" of the patients for whom the Oxycodone had been withdrawn had neither complained of pain nor received the drug on that occasion. Mr. Fitzgerald immediately volunteered to undergo a drug test, and the results were negative.
Following that conference, Mr. Primes' employment with Lakeview was terminated for inappropriate documentation. Ms. Coker was asked at the hearing why she had not ordered Mr. Primes to take a drug test in connection with this investigation. She replied:
Ms. Coker: Like I said, Ian had already gone home. I'm at the hospital. I mean Dawson had gone home. It had been several hours. When I got to work I asked the pharmacy director what he thought. We just didn't. Should I have, maybe it would be the best thing, but I didn't.
Q: You could have, but you didn't?
Ms. Coker: We could have, but we didn't.
Mr. Primes was questioned concerning the Employee Conference Report dated May 10, 2005. Mr. Primes testified that he did administer the medicine to the patient. He described the procedure by which this type of medicine is administered. The nurse takes a cart containing the medicine into the patient's room. He then scans the patient's bracelet, scans the medication, administers the medicine, and removes the cart from the room. Mr. Primes testified that he followed this procedure with the patient, and "absolutely" gave the patient his medication. In his opinion, the patient was not telling the truth in order to receive an additional dose of his medication. Mr. Primes testified that this "happens to every nurse, almost." Mr. Primes admitted that he did not perform a pain re-assessment two hours after having administered the drug, because he was busy with the other seven patients who were under his care.
Ian Fitzgerald, R.N., testified that he worked with Mr. Primes in the Lakeview ICU and described him as a "good nurse and [a] good man." He was working a shift with Mr. Primes on May 7, 2005. Thereafter, he was told that a narcotic drug was logged out under his name, to be given to a patient who allegedly had not received the drug. In order to clear his name and to have some evidence that he was free of drugs, he elected to undergo a drug screening. Because he never learned the results of the screen, he assumed it was negative. He testified that he had no knowledge that Mr. Primes at any time used or ingested any medication from Lakeview.
Mr. Primes was examined concerning the improper logging of the medication, and explained that this related to the patient discussed previously who had claimed he had not received his afternoon medication. According to Mr. Primes, he had inadvertently used Mr. Fitzgerald's scanner when he scanned the patient's bracelet and the drug. Thus, the administration of the medication was documented, but because of the use of Mr. Fitzgerald's scanner, *578 the administration of the drug was attributed to Mr. Fitzgerald. Mr. Primes denied under oath that he knew that he was using Mr. Fitzgerald's scanner, and not his own.
Ms. Coker testified that Mr. Primes complained to her of recurrent nightmares associated with his military service in Afghanistan, and of back pain for which he had taken pain medication. Mr. Primes testified that he was injured in Afghanistan when trying to load up a trailer in a procedure that requires four men; only he and one other man were picking up the tongue of the trailer and trying to attach it to the ball of a Humvee. Because the Humvee driver had to drive off quickly after the attachment, he did not have the vehicle in "Park" during the operation. The driver, having forgotten that the vehicle was in gear, took his foot off the brake, causing the vehicle to move forward, placing the entire weight of the trailer on Mr. Primes and his colleague. The colleague let go, and Mr. Primes was jerked to the ground, suffering a back strain. Two or three days later, Mr. Primes returned to the main base and sought medical advice. The doctor prescribed eight hundred milligrams of Motrin, which Mr. Primes took as prescribed through the balance of his deployment until April or May of 2005. He returned home and voluntarily reduced his dosage after having consulted a nephrologist who warned him of potential damage to his kidneys from high dosages of Motrin. Mr. Primes then began an exercise program at the nephrologist's suggestion and was able to stop taking Motrin altogether. He testified that he was still observing his exercise program at the time of the hearing.
Lisa King, R.N., testified that she supervised Mr. Primes when he was employed at Primecare beginning in May of 2005 until he was deployed to Germany in June of the same year. As noted hereinabove, the Hearing Officer found Ms. King's testimony to have been irrelevant, since it does not relate directly to Mr. Primes' activities at Lakeview. We note it here insofar as it is evidence of his character and is relevant to the Board's finding that Mr. Primes was habitually intemperate and addicted to habit-forming drugs while working at Lakeview. Since he left Lakeview in May, 2005 and began to work under Ms. King's supervision later that same month, her testimony is relevant only insofar as it indicates his temperance, or lack thereof, immediately after his termination by Lakeview.
Ms. King testified that several weeks after the conclusion of Mr. Primes' deployment to Germany, he returned to Primecare and worked full-time until Hurricane Katrina struck on August 29, 2005, working at Primecare for a total of about three months. She provided his initial direct training. In the course of her supervision of Mr. Primes, she would speak with him every day concerning various patient issues and met with him about three times a week. She testified that Mr. Primes did not hesitate to contact her or to request her guidance. She did not recall having prepared a formal supervisory report on Mr. Primes, but had no concerns at all about his competency or his ability to perform his duties as an L.P.N. She testified that Mr. Primes was "an excellent nurse" and that she "very definitely" is ready to have him come back to work at Primecare.
Mr. Primes offered without objection a letter from Sean M. Roberts, M.D., a physician who is board certified in internal medicine, critical care pulmonology and nephrology. Dr. Roberts also has one of the largest patient censuses at Lakeview. Dr. Roberts wrote:

*579 I have had the opportunity to observe and work with Mr. Primes for the past three years as a staff physician at Lakeview Regional Medical Center. I typically carry a large inpatient census, therefore I have many opportunities to interact with nurses regarding patient care. Mr. Primes has always been professional and competent in caring for his patients. Furthermore, his clinical knowledge and judgment has [sic] set him apart from his co-workers. His experience and professionalism will keep him in the upper tier of nurses at Lakeview Regional Medical Center. He seems to be eager to help his colleagues and is well-liked by both patients and nurses alike. He's an asset to the nursing staff, and I continue to have confidence in his abilities. Respectfully yours, Sean M. Roberts, M.D.
Mr. Primes testified that he has undergone random drug testing both as a nurse and in the military, the most recent of which was two weeks before the hearing, and all results were negative.
On March 30, 2006, the Board entered Conclusions of Law finding Mr. Primes to be in violation of La.R.S. 37:969 A(4):
(c) as unfit, or incompetent by reason of negligence, habit, or other causes;
(d) as habitually intemperate or addicted to the use of habit-forming drugs; and
(f) as guilty of unprofessional conduct.
The Board further concluded that Mr. Primes was in violation of the Louisiana Administrative Code, Title 46, Part XLVII. Nurses, Subpart 1, Practical Nurses, Section 306(T):
3. as being unfit, or incompetent by reason of negligence, habit or other causes;
8. as being guilty of unprofessional conduct in the following:
a. failure to practice practical nursing in accordance with the standards normally expected;
g. improper use of drugs, medical supplies, or patients' records;
j. intentionally committing any act that adversely affects the physical or psychosocial welfare of the patient;
l. leaving a nursing assignment without properly notifying appropriate personnel;
p. inappropriate, incomplete or improper documentation . . .
4. possession of a physical or psychological impairment which interferes with the judgment, skills or abilities required for the practice of practical nursing.
The Board suspended Mr. Primes' nursing license, fined him $500 for the violations contained in the Conclusions of Law, assessed a hearing fee of $500, and required Mr. Primes to undergo a chemical addiction assessment from a Board approved clinician and to secure a letter indicating that he may safely return to the practice of practical nursing and listing all currently prescribed medications and further treatment or therapeutic recommendations. When the foregoing information has been secured and submitted to the Board for review, Mr. Primes will be allowed to submit a written request for reinstatement of his license. Upon payment of the fees and fines, and after the Board's favorable review of the records, Mr. Primes' license may be placed on probation for four years with a series of stipulations concerning notice, stability of employment, supervision, abstinence from the use of controlled substances and alcohol except as may be prescribed by a licensed practitioner and random drug screening at Mr. Primes' expense. The Board did not impose any sanctions or make any requirements concerning the various charges relating *580 to incomplete or incorrect documentation of administration of medications.
On April 7, 2006, Mr. Primes timely filed a Petition for Rehearing and Reconsideration pursuant to La.R.S. 49:959, which provides in pertinent part:
A. A decision or order in a case of adjudication shall be subject to rehearing,. . . or reconsideration by the agency, within ten days of the date of its entry. The grounds for such action shall be either that:
(1) The decision or order is clearly contrary to the law and the evidence;. . .
Mr. Primes sought rehearing as to the Board's legal conclusion that he was "habitually intemperate or addicted to the use of habit forming drugs", noting the absence of testimonial or objective evidence of such intemperance or addiction. The Board's Executive Director replied on April 12, 2006, denying the request for a rehearing. The reply does not cite any particular testimony, or identify a witness or document that supports its findings of habitual intemperance and addiction, but claims:
A review of the entire record indicates that there is sufficient testimony and evidence in the record for the board to have reached all conclusions of law as set forth in the board order, including that of habitual intemperance or addiction to the use of habit-forming drugs and of being unfit or incompetent by reason of negligence, habit or other causes. Therefore, your request for rehearing and reconsideration is denied.
On April 17, 2006, Mr. Primes, through counsel, again asserted that there was no evidence in the entire record of habitual intemperance and addiction, and stated:
. . . I cited a portion of the testimony of Tina Coker, R.N., Chief Nursing Officer at Lakeview Regional Medical Center, because Ms. Coker's testimony concerning Mr. Dawson's suspected drug use or abuse is the only testimony of all the witnesses for the Board which addressed the suspicion of drug abuse in more than a cursory fashion. And I reiterate once again that Tina Coker testified that she had no evidence that Mr. Primes abused drugs. (Transcript, p. 48).
With all due respect, . . . I am compelled to ask whether you or anyone else did, in fact, review the entire record. . . to determine that what my petition stated was true, which is that there was no evidence in the entire record which supported the Board's decision on this single issue. If so, I respectfully request that you cite for me the testimony or other evidence in the record which supports the Board's decision [as to habitual intemperance and addiction]. Unless you can show me such evidence, the only reasonable conclusion is that Mr. Primes was found guilty of this conduct on mere suspicion alone. [Emphasis in original.]
The Executive Director replied, declining to cite testimony or other evidence supporting that finding, claiming that "the record and the report of the hearing officer, taken as a whole, indicates [sic] that there is sufficient testimony and evidence in the record for the board to have reached all conclusions of law as set forth in the board order." [Emphasis in original.]
On May 10, 2006, Mr. Primes filed a Petition in the district court for review of the administrative adjudication pursuant to La.R.S. 49:964, et seq. That statute sets forth the exclusive grounds upon which an administrative agency's decision may be reversed or modified on appeal. The reviewing court, in this case the Civil District Court for the Parish of Orleans, may reverse *581 or modify the Board's decision if the appellant's substantial rights have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. . . . La.R.S. 49:964 G. [Emphasis added.]
In the instant case, Mr. Primes appealed, contending that his substantial rights to his L.P.N. license and employment thereunder have been prejudiced because the administrative conclusions that he is habitually intemperate and is addicted to habit-forming drugs are not supported and sustainable by a preponderance of evidence. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues. La.R.S. 49:964 G(6).
The matter proceeded to a bench trial on October 12, 2007, following which the trial court entered judgment vacating the Hearing Officer's findings of fact and conclusions of law finding Mr. Primes to be habitually intemperate and addicted to habit forming drugs; setting aside the provisions of the Board's Order of March 30, 2006 suspending Mr. Primes' L.P.N. license and setting forth terms of reinstatement and probation other than payment of $1,000 in fines and fees; and setting aside the Board's Order requiring substance abuse evaluation or treatment. The judgment requires Mr. Primes to submit to a single drug screen by an entity acceptable to the Board within seven days of October 12, 2007. Upon a negative drug screen, Mr. Primes' license will be reinstated immediately upon documentation of successful completion of an approved course of study in medication administration and documentation approved by the Board, without any further conditions of probation, suspension, or restriction. Upon a positive drug screen, the matter will be reset for further expedited review so as not to prejudice any party's appeal rights.
In light of the terms of the judgment, the only issue on appeal is whether the Board proved, by a preponderance of the evidence, that Mr. Primes was habitually intemperate and addicted to habit-forming drugs, and whether the remedy fashioned by the trial court was reasonable. In all other respects, the trial court affirmed the factual findings of the Board and that affirmance has not been appealed.
The Board contends that the district court erred and abused its discretion in reversing the Board's findings of habitual intemperance and drug abuse because Mr. Primes did not carry the burden of proving that the record contains no facts to establish the validity of the charges levied against him, where the Board's decision is supported by a preponderance of the evidence.
The Board cites Armstrong v. Louisiana State Board of Medical Examiners, 03-1241, p. 11 (La.App. 4 Cir. 2/18/04), 868 *582 So.2d 830, 838. In that case, a physician sole practitioner appealed a trial court judgment affirming a disciplinary order imposed by the Louisiana State Board of Medical Examiners for violation of the board's rules concerning treatment of non-cancer-related chronic or intractable pain in his treatment of eleven patients. In that case, upholding the trial court's affirmance of the disciplinary order, this Court noted that Louisiana jurisprudence recognizes that in reviewing these cases, courts must be cognizant of "the strong presumption of validity and propriety" of the administrative action, where the judgment imposed on a professional's behavior is a matter peculiarly within the expertise of an agency composed of members of that profession. Armstrong v. Louisiana State Bd. of Med. Examiners, p. 11, 868 So.2d at 838, citing Montalbano v. Louisiana State Bd. of Med. Examiners, 560 So.2d 1009, 1011 (La.App. 4 Cir.1990).
The issue before us is whether, given this presumption and these considerations, the record contains a preponderance of evidence that Mr. Primes is habitually intemperate and addicted to the use of habit-forming drugs. While we recognize the presumption of validity and propriety in the Board's conclusion to that effect, we find nothing in the jurisprudence to indicate that this presumption is irrebutable. We find that the presumption must be read against the explicit statutory pronouncement that the reviewing court is to determine upon its independent review of the record as a whole whether the agency proved its case by a preponderance of the evidence. La.R.S. 49:964 G(6). The trial court applied the presumption, stating on the record:
I will give and I always giveif you check my record, every time I'm up to review an administrative proceeding, I always indicate that there's a presumption that runs with the Board, whatever that administrative Board is, and I give that presumption here.
However, that presumption doesn't lend itself to speculation and guesswork. The decision still has to be based on reason, on reason, and you cannot give a leap of faith to an administrative body simply because it believes based on irritability. That could be attributed to any number of other factors, in fact, factors that would be probably even more prevailing than drug abuse would be.
* * *
The evidence, the only objective evidence, only objective evidence [the drug screening] came up negative, and that's the test that they applied. The only objective evidence was the evidence of the drug test that they gave. That came up negative. They didn't like the way that came up. So, then, they're going to go and say that irritability can also be an outward sign of drugs. Yes, it can be, but so can distress as a result of decompressing or post-traumatic stress as a result of serving his country in Afghanistan. Why don't we give the guy a break and look at it that way.
* * *
They [the Board] made an assumption. You point to something that a reasonable person could conclude that there was a drug abuse problem when the test, the objective test, said no and if the only thing you're going to tell me is they can speculate that that is the case because he was irritable, you know what my response to that is going to be.
The trial court then pointed out that the only proven basis for discipline was inappropriate documentation; however, the Board's Order does not direct Mr. Primes to undergo training in the proper protocol *583 for documentation which, the trial court concludes, would be the reasonable response. The trial court noted on the record:
The documentation thing, plain and simple, was a pretext because you had him dead to right on the documentation. So, what you do then is you used that as a means to do what you wanted to do anyhow, which is the drug testing. Because you start out with the conclusion that he's abusing drugs.
So, you get to that conclusion, you support that conclusion by finding what you know you do have, inappropriate documentation, and then your forget about that [documentation] in terms of the penalty phase, because you don't do anything to try to correct the inappropriate documentation.
* * *
And notice, they wanted to give him the drug screen on the day that, again, he appeared red-faced and irritable, and it comes up negative. The same conduct that was leading them to conclude that there was a drug abuse problem existed on the day that they did the screening and it comes up negative. So, what's the guy got to do to show that he's not dealing with drugs?
In support of the validity of the negative drug test, the trial court noted:
When he came in in January, it was a randomly applied test. He came in; they said he looked red-faced and irritable, and what we're going to do is we're going to give him the drug test because he's in that condition that makes us believe that he's abusing drugs. And that's what they did. It was a random test then.
The only evidence of Mr. Primes' having been red-faced and irritable relates to the January 29, 2005 incident. The objective evidence of record is that he was gone from the unit on an announced smoking break, and remained away from the unit for an hour and forty-five minutes. There is no testimony that he had access to his cellular telephone or a pay telephone during that time. The objective evidence of the February 1, 2005 repair bill[13] from Pritchett's Repair Service supports Mr. Primes' testimony that he had a serious problem with his car two nights before.
There is no testimony that anyone saw Mr. Primes use drugs on January 28-29, 2005. However Ms. Coker testified that when she advised Mr. Primes of the negative result of his drug screen, she warned him that his "behavior is too bizarre not to explain something else going on," a comment she testified referred to drug abuse. Ms. Coker also testified that Ms. Young and Ms. Comeaux indicated to her that they were surprised that Mr. Primes' drug test, for which he gave a urine specimen on January 29, 2005, returned a negative finding.
There is, however, the objective evidence of the negative drug test that supports his testimony that his irritability and flushed face were the result of his car having broken down twice, his having walked over a mile in the cold night air without a jacket, clad only in his scrubs, and his facing both an impending substantial car repair bill and supervisors who were waiting to question him concerning his absence.
The correspondence from the Board's Executive Director in response to Mr. Primes' request for a rehearing or reconsideration clearly indicates that the Board *584 would not or could not provide testimonial or documentary evidence that Mr. Primes was habitually intemperate and addicted to the use of habit-forming drugs. The correspondence refers to "the record taken as a whole." As noted hereinabove, that record provides ample evidence of deficiencies in Mr. Primes' documentation of medication and patient records. The suggested implication appears to be that the deficient documentation served as a cover for Mr. Primes' taking controlled drugs from the hospital for his own use. We find Ms. Coker's testimony on this point to be instructive:
Q: But you have no evidence that something was going on involving drugs taken from the hospital?
Ms. Coker: Except inappropriately taking the wrong number out and not documenting.
Q: But that's documentation problems, that's not evidence of actual physical use of the substance?
A: That's correct.
We must agree with the trial court that the evidence contained in this record does not preponderate to support a finding that Mr. Primes was habitually intemperate and addicted to habit-forming drugs.
The Board contends that the trial court erred in substituting its judgment for that of the Board where there was a rational basis, supported by sufficient relevant and admissible evidence, for the Board's Order. The Board cites Davis v. Louisiana State Board of Nursing, 96-0805, p. 4 (La.App. 1 Cir. 2/14/97), 691 So.2d 170, 173. In that case, the court affirmed a trial court judgment affirming the Board's denial of the plaintiff's request to take the National License Examination for Registered Nurses. The appellate court noted that an agency decision is entitled to great weight and should be upheld unless it is manifestly erroneous or arbitrary and capricious, and applied the manifest error standard to the Board's factual findings. In the instant case, the Board concluded, based on the Hearing Officer's findings, that Mr. Primes was habitually intemperate or addicted to the use of habit forming drugs. The Board's counsel pointed out to the trial court that neither the Court of Appeal nor the trial court could substitute its judgment for that of the Board. The trial court correctly responded, "As long as the Board's decision is based on the record-on a rational line of reasoning," to which counsel agreed.
Under the manifest error standard of review, and applying both the presumption of validity and propriety and the principle that the trial court may not substitute its judgment for the rationally-based judgment of the Board, we are compelled to conclude that this conclusion by the Board is not supported by the objective and testimonial evidence outlined herein.
The Board contends that insofar as the judgment of the trial court requires Mr. Primes to take a drug test and is, in part, conditioned on the results of that test, it violates La.R.S. 49:964 F and G(6). La.R.S. 49:964 F requires that the review of the Board's order shall be conducted by the court without a jury and shall be confined to the record. La.R.S. 49:964 G(6), cited supra, requires that the reviewing court shall make its own determination by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety.
Initially, we observe that it is clear that the post-trial drug test was not ordered in order to provide evidence that Mr. Primes was or was not under the influence during the time in question. It is clear from the trial court's comments that the purpose of the post-trial test was to provide a safeguard against Mr. Primes' receiving the *585 benefit of reinstatement if he was then abusing drugs. We note from the transcript that there was lengthy discussion among counsel and the trial court concerning the post-trial drug test. At no point in the discussion did counsel for the Board or counsel for Mr. Primes object to the requirement that Mr. Primes undergo a drug test within seven days of the conclusion of the trial. In fact, the timing of the drug test was suggested by counsel for the Board. While Board counsel did not agree that a negative drug test would be conclusively probative as to Mr. Primes' non-use of drugs, at no time was it suggested that a post-trial drug test would violate the provisions of La.R.S. 49:964 F and G(6).
The trial court, having reviewed the transcript of the evidentiary hearing, concluded that indeed there was no evidence of drug abuse. The trial court noted that the Board representative, when asked at the hearing for evidence that Mr. Primes was abusing drugs, replied, "I have none." The trial court properly refused to equate evidence of some irritability on Mr. Primes' part with evidence of drug abuse. Thus, the post-trial drug test, to which no counsel objected, if erroneous as a matter of law is nonetheless surplusage, and the legal error, if any, is harmless.
Our independent review of the record in its entirety convinces us that the Board's judgment concluding that Mr. Primes was habitually intemperate and addicted to habit-forming drugs is manifestly erroneous, and that the Board did not prove that habitual intemperance and addiction by a preponderance of the evidence. We also note that the Board's decree does not provide for Mr. Primes to undergo any counseling or education concerning the many documentation errors to which Mr. Primes admitted. We find the trial court's judgment providing for reinstatement of Mr. Primes' license to practice practical nursing immediately upon documentation of successful completion of an approved course of study in medication administration and documentation pre-approved by the Louisiana State Board of Practical Nurse Examiners, to be reasonable and supported by the evidence adduced at the hearing.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
TOBIAS, J., concurs in part and dissents in part.
TOBIAS, J., concurs in part and dissents in part.
I respectfully concur in part and dissent in part for the reasons that I formerly assigned. I again reiterate that the Board should decide the appropriate sanction to be imposed upon Mr. Primes, not the trial court or this court in light of the Board's duty to protect the public. The Board has the expertise to understand the full context of that which Mr. Primes did and set the appropriate sanction or punishment.
NOTES
[1] The words or phrases in quotation marks are the words used by Mr. Primes during his testimony to describe his observations.
[2] In connection with this testimony, the hearing officer received in evidence a copy of a repair bill dated February 1, 2005, covering the replacement of the car's alternator.
[3] The hearing officer admitted the results of the negative drug test into evidence.
[4] This testimony is contradicted by the objective evidence that Mr. Primes was gone for one hour and forty-five minutes.
[5] We note again that the objective evidence indicates Mr. Primes was gone from the unit for one hour and forty-five minutes.
[6] The objective evidence, as noted above, indicates an absence of one hour and forty-five minutes.
[1] It appears that certain exhibits had become separated from the record on appeal when this matter first was considered. We grant a rehearing in order to give proper consideration to those exhibits.
[2] The Hearing Officer found Ms. Coker, Ms. Young, Ms. Comeaux, Ms. Romero, and Mr. Fitzgerald to be credible, knowledgeable, and well organized in their presentations. He did not find Ms. Waller's testimony to be credible. He found Ms. King's testimony to be irrelevant to the case because, although, at the time of the hearing, she supervised Mr. Primes, she did not work with or supervise him during his tenure at Lakeview Medical Center.
[3] Immediate supervisor Austin signed as a witness to the document. She was not called to testify at the hearing.
[4] Ms. Detomo was not called to testify at the hearing. In testimony before the Hearing Officer, Tina Coker identified Ms. Detomo as the hospital's director and risk manager, who left Lakeview in July of 2005. When questioned by counsel for Mr. Primes, Ms. Coker testified she did not know why Ms. Detomo was not named or called as a witness. Mr. Primes testified that Ms. Coker told him that Ms. Detomo was reassigned, perhaps to Texas or California, but that he did not know her present location and had not been in contact with her.
[5] The words or phrases in quotation marks are the words used by Mr. Primes during his testimony to describe his observations.
[6] In connection with this testimony, the Hearing Officer received in evidence a copy of a repair bill from Pritchett Repair Service in Roseland, Louisiana, addressed to Mr. Primes and dated February 1, 2005, covering the replacement of the car's alternator.
[7] A copy of Lakeview's "Drug Free Workplace" policy was introduced without objection before the Hearing Officer. Relevant provisions of the policy include the following: "3.1 Prohibited Activities: The . . . use, possession, reporting to work with a measurable quantity in blood or urine, or working while impaired by intoxicants, non-prescribed narcotics,. . . or other non-prescribed controlled substances is prohibited while on the Hospital property or during working hours. . . .3.3 Circumstances under which a drug test may be administered: . . . (b) Where there is reason to believe in the opinion of the Hospital that an individual under the scope of this policy is impaired by intoxicants, drugs or narcotics while on the Hospital property or during working hours or that an individual under the scope of this policy has reported to work with a measurable quantity of intoxicants, drugs or narcotics in blood or urine.... 3.5 Drug testing: ... An individual under the scope of this policy may be requested to undergo a blood test, urinalysis, breathalyzer test or other diagnostic test under the following circumstances:. . . b. Where there is reason to believe, in the opinion of the hospital, that an individual under the scope of this policy is under the influence of, or impaired by alcohol or drugs, prescribed or non-prescribed, while on hospital property or during work hours, or that an individual has reported to work with a measurable quantity of drug in his/her blood or urine. . . . d. Where there is any unusual occurrence which, in the opinion of the hospital, could indicate the use of alcohol or drugs. . . . PROCEDURE 4.1 If, in the judgment of an individual's supervisor, an individual under the scope of this policy is behaving in a manner suggestive of being under the influence of drugs or alcohol, the supervisor should immediately contact [sic] the House Supervisor. The supervisor should carefully document [sic] his/her observation in behavioral terms. 4.2 The supervisor will confront the individual about his/her behavior and, when deemed appropriate, will request that the individual submit to a drug or alcohol test or search of person or property. 4.3 The individual will be escorted to the designated drug/alcohol testing site by the supervisor. An employee will be placed on paid suspension pending the results of the drug-alcohol test.... 4.4 Drug/alcohol test results will be reviewed by the Medical Review Officer. These confidential results will be forwarded ONLY to the Risk Manager and then sent to the HR Director and appropriate Senior Manager. Upon receipt of the drug-alcohol test results, the individual will be contacted by the Human Resources Director. . . . If the results of the test are negative, the individual under the scope of this policy will be returned to work."
[8] The Hearing Officer admitted the results of the negative drug test into evidence. The test, performed by HD LabCorp of Houston, showed negative results for amphetamines, barbiturate, benzodiazepines, cannabinoid, Cocaine (Metab.), opiates, phencyclidine, and ethanol U.
[9] This testimony is contradicted by the objective evidence that Mr. Primes was gone for one hour and forty-five minutes.
[10] The statements relate both to the charge that Mr. Primes withdrew controlled medications without accounting for them, and to the implication that he self-administered them during his absence from the hospital on January 28-29, 2005.
[11] We note again that the objective evidence indicates Mr. Primes was gone from the unit for one hour and forty-five minutes.
[12] The objective evidence, as noted above, indicates an absence of one hour and forty-five minutes.
[13] According to the bill, admitted without objection before the Hearing Officer, the repair service replaced the alternator, for a total charge including labor of $262.90.